**JOHN DEERE COMPANY OF ST. LOUIS, a Corporation, Respondent,**

v.

**Newton H. SHORT, d. b. a. Short Equipment Company, Appellant.**

**No. 50157.**

Supreme Court of Missouri,

Division No. 1.

May 11, 1964.

George E. Sullivan, O'Fallon, for defendant-appellant

William M. Howard, Robert L. Sweney, St. Louis, for plaintiff-respondent; Bryan,

Cave, McPheeters & McRoberts, St. Louis, of counsel.

HOUSER, Commissioner.

John Deere Company of St. Louis sued Newton H. Short in three counts, Counts I and II in replevin for possession of farm equipment; Count III for damages for breach of a general agricultural dealer's contract. Short filed an amended counterclaim in two counts, Count I for damages for fraud; Count II for $150,000 actual and $150,000 punitive damages, for conspiracy. By stipulation judgment was entered for plaintiff on Counts I, II and III of the petition under an agreement that the amount of the judgment on Count III would depend upon a determination by the court whether defendant was entitled to a volume discount. If so, the judgment was to be for $13,303.50 on Count III; if not, the judgment thereon was to be for $26,187.50. The issues on Count II of the counterclaim were tried to a jury, which returned a verdict for Short and against John Deere for $46,700 actual and $10,000 punitive damages. The court found that Short was not entitled to a volume discount and entered judgment for Short for the net sum of $30,512.50. John Deere filed an after-trial motion for judgment in accordance with its motion for a directed verdict and in the alternative for a new trial. The court granted the motion and entered a new judgment for John Deere for $26,187.50 under Count III of the petition; for John Deere for possession under Counts I and II; against Short on his counterclaim, and made the appropriate order under Supreme Court Rule 72.02, V.A.M.R. Short appealed.

Short was employed by John Deere in various capacities from March 1, 1950 until sometime in 1955, when he resigned to take other employment. During a part of the time he was employed by John Deere his immediate superior was one I. L. Parks, Division Sales Manager for John Deere. Parks not only worked for John Deere as an employee but also owned an interest in a John Deere dealership at Elsberry, with his son Robert. In 1958 one Pottmeyer, Division Credit Manager for John Deere, told Wayne Carter, a traveling inspector for John Deere, that he knew that Parks had an interest in the Elsberry dealership; that Parks had sold his home in St. Louis and poured all the money he had into the dealership, and that in his opinion it was "broke." Parks had given mortgages on John Deere equipment sold to farmers, and engaged in other practices which eventually resulted in his discharge by John Deere. In 1958, before Parks' discharge, he met Short one day and sought to interest Short in buying into the Elsberry dealership. Several discussions culminated in Short buying into the dealership. A new corporation was formed for the conduct of the business. Short paid the corporation $15,000. Parks and his son Robert put the assets of the old company into the new business, and each of the three men put in an additional $1000 as operating capital. A franchise dealer contract was entered into between John Deere and the new corporation in January, 1959. Short actively entered the business, taking care of parts and service, while Robert handled sales and accounts. I. L. Parks continued in his capacity as division sales manager, came to Elsberry on weekends, and dictated the operation of the business. In February or March, 1960 I. L. Parks asked Short if he wanted to buy out the Parks. Between then and September, 1960 the parties met five or six times to discuss the proposition. Short's father-in-law, an experienced business man, was concerned because operating capital was needed and Short's resources were limited. Short realized that he would need operating capital the next spring. At the fourth meeting, in August, I. L. Parks made an oral promise that Short would get "an operating loan" from John Deere when Short needed it. Short had talked to the John Deere dealer at Paris, Missouri, from whom he had learned that the company had made an operating loan to that dealer. Again in September, 1960 I. L. Parks gave

Short and his wife and father-in-law a promise that they would get an operating loan when they "needed one." There was no evidence that I. L. Parks had authority to commit John Deere to an operating loan to Short. The only person with that authority was the vice-president and general manager. Parks did not discuss with Short the amount of the prospective loan, the period of the loan, or when it would be made, "except just generally in the spring." According to Short the interest rate was to be either 5 or 6 per cent, but according to Mrs. Short the subject of interest was not discussed. Short testified that security was mentioned in the discussions but could not recall what security was discussed. No written application for a loan was ever made to the company. At no time did Short ever discuss a loan with any company employee or official other than Parks, although Short knew several John Deere officials and had an opportunity to discuss this matter with them. For instance, in September, 1960 Short visited the company's general sales manager, P. M. Maddox, in his St. Louis office, at which time Short was assured that as a new dealer he would be treated "as fair as any new dealer going into the organization," but Short did not ask Maddox about the capital loan.

The sale of the Parks' interest in the Elsberry agency was consummated on October 20, 1960. Short paid Parks and his son $15,000 and gave a note for $26,830 to Elsberry Equipment Company, Inc. Short began operations as Short Equipment Company in October, 1960, with $2,000 operating capital and an inventory of $75,000. Early in November, 1960 John Deere and Short signed a dealer's contract by which the company agreed to sell and Short agreed to buy the company's products, subject to and in accordance with the terms of the contract, and the company agreed to make available to Short "Any finance plan for [dealers] which the Company may have in force during the term of this contract" to assist the dealer in financing sales, with the understanding that the company might

without liability or obligation change or discontinue any such plan at any time without notice. John Deere agreed to reimburse the dealer for the cost of parts and for labor done under company's authorized warranties. The parties also signed a floorplan agreement for trade-in of agricultural equipment, and a credit plan for new and used equipment sold for agricultural purposes. The object of the floor plan was to assist the dealer in financing certain specified trade-in machines accepted as part payment in the original sale of new John Deere equipment. When a sale was made the dealer was to remit to the company the cash and the note received from the purchaser, and the dealer's account would be credited with the cash and an "acceptable" purchaser's note. The company reserved the right to establish the maximum value of any trade-in machine and a limit of credit to be extended to a dealer for total floor-plan notes. Under the credit plan the company agreed to accept purchasers' notes as a credit to the dealer's account with the company, subject to the conditions of the contract. Late in November, 1960 Short was called in to the St. Louis office of John Deere where inquiry was made of him concerning a customer's tractor which I. L. Parks had mortgaged to John Deere. Apparently the company representatives were investigating Parks. This was the first time Short knew that I. L. Parks was in trouble with John Deere. Concerned about the repercussions which the investigation might have in his community, Short asked for and obtained from the company officials a promise of cooperation. Parks resigned in December, 1960 and was replaced by Willard Finn. In January, 1961 Short discussed with Finn his "need for operating capital later on"; asked Finn about the operating loan promised by Parks; told Finn that he "was going to have to have it" if he were to continue as a successful dealer. Finn did not give Short either an affirmative or a negative answer on the matter of a loan, but from the conversation Short concluded that Finn was going to "follow it through." Finn

considered the matter but did nothing about it; did not pursue it with anyone at John Deere. In the spring of 1961 Short needed operating capital. He had operating expenses, payrolls, rent, etc. to pay. The farmers ran up sizeable credit accounts for repairs during this season. Considerable work was done for farmers on company warranties. Short had to pay cash for the parts used, and although he was later to be reimbursed there was a time lag during which interval his money was tied up. Short took in a number of expensive trade-ins. Because his capital was restricted Short used the cash he received from sales to pay operating expenses, and did not remit to John Deere for the equipment purchased from the company. In June, 1961 the company put Short on a C.O.D. basis. Having to pay cash limited his operations insofar as discounts and "trade conditions" were concerned. Two representatives of John Deere, Janey and Rake, the latter of whom was branch house credit manager, came to Elsberry in June to take inventory, with instructions not to let Short sell another piece of new goods. They stayed at Short's place of business two or three days. During that time they "killed" the sale of a straw chopper to one Bradley, who offered to give a check direct to John Deere in payment. The inventory disclosed that Short had sold goods for which he had not paid. The shortage amounted to $22,000. During this visit Rake and Janey told Short that he was not going to get an operating loan. After their visit the volume of sales was less than 25% of the sales before their visit. In July, 1961 Short received an invoice from the Kansas City parts depot for the June parts stock order, across the face of which was written "Discontinued dealer." In numerous instances labor and parts claims under warranties were delayed or never paid. Sometimes goods ordered from John Deere were not delivered within the time normally to be expected, or never delivered. In November, 1961 Short had a sale for a tractor and sent his truck to pick it up.

As it was being loaded onto his truck at the warehouse the loader received orders to back it off the truck, and company representatives informed Short's serviceman that Short was not going to get the tractor. Two harrows ordered July 12 were not delivered until after September 1, after Short had lost the sale. Two harrow sections ordered on April 24 were not delivered until May 25, although normal delivery is immediately or within two weeks. Short did not receive credit on certain surplus goods returned to the company. Attachments ordered in January were delivered after the middle of May, too late for use during the planting season. On a number of shipments the company invoiced Short at regular list prices charged farmers instead of billing him at wholesale prices, to which he was entitled. In November, 1961 company representatives made another inventory, found that the shortage had been increased by $21,000, asked Short for the money he owed the company and requested possession of the merchandise still in stock. Short refused to voluntarily give the company possession of the goods and stated the company would have to get a court order to take the goods. On November 30, 1961, John Deere instituted the replevin suit and in early December the sheriff seized the goods and equipment on hand. In January, 1962 Short had a public sale of what was left and closed the business.

Short purchased over $190,000 worth of goods from John Deere in 1961. Short invested $16,000 in the business on September 4, 1959; $1,500 or $1,600 in late 1959 or early 1960; paid $15,000 to Elsberry Equipment Company in October, 1960; gave a promissory note for $26,830 as heretofore described; put $2,300 or $3,300 into the business in December, 1960; $1,000 early in 1961; $5,400 through the summer and up until October, 1961; and another $9,000 after September, 1961.

At the conclusion of all the evidence the court directed a verdict for plaintiff on Count I of defendant's counterclaim, (the

charge of fraud),[1] and submitted the case to the jury on Count II, in which it was alleged that through its agents and servants John Deere entered into a malicious conspiracy to destroy Short's business as a John Deere dealer and that said agents and servants acting in concert caused I. L. Parks to make the fraudulent representation that if Short would enter into the dealer's contract with John Deere he would have full cooperation of the company, which would make cash and equipment loans to Short and enter into the company's finance plan with him, make prompt delivery of its products, and would do business on liberal credit terms and not on a cash on delivery basis; that John Deere failed to cooperate with Short as a franchised dealer; failed to grant him cash or equipment loans, or to implement the finance plan; failed to make prompt delivery of products and parts; required him to pay cash on delivery, and harassed him with lawsuits. In granting John Deere's motion for judgment on the counterclaim in accordance with its motion for a directed verdict the circuit court found that in six different respects there was not sufficient evidence to sustain its theory of recovery on Count II.

On this appeal Short contends that the evidence, both direct and circumstantial, was sufficient in all respects to sustain the verdict in his favor on Count II, because it shows that John Deere knew of Parks' interest in the Elsberry dealership, and of his defalcations; knew it would take outside capital to "bail out Parks in the dealership so they could get rid of him as an employee"; is charged with knowledge of Parks' promise of the loan to Short, or is estopped to deny the agency since it accepted all of the benefits after knowledge of the loan; received $15,000 paid by Short to Parks and by Parks to John Deere to settle Parks' account; knew Short had little or no operating capital and that he needed it badly in the spring of 1961, but nevertheless failed

to make the promised loan and instead did everything it could to further decrease his operating capital, by failing to deliver machinery and parts on time, failing to credit him with warranty work done or reimburse him for parts purchased for warranty work, so they could put him on C.O.D. in June, 1961 and "throw him to the wolves," as a result of which his business was destroyed.

Short's counterclaim sounds in tort. It is based upon the charge that the John Deere Company corporation, by and through its agents and employees, entered into an unlawful and malicious conspiracy against Short, the malicious and wrongful design of which was to destroy Short's business as a dealer for John Deere and thereby unlawfully, maliciously and wrongfully cause Short to go out of business as a dealer, to his financial loss and ruin.

The charge of conspiracy fails. Only the corporation (by its agents) is charged with conspiracy. The corporation is the only entity sued. A corporation cannot conspire with itself. Poller v. Columbia Broadcasting System, Inc., D.C. Cir., 284 F.2d 599, 603. Furthermore, Short did not sustain the burden of proving the alleged conspiracy. There is nothing in the record to indicate directly or by inference that any of the agents and employees of John Deere entertained any spite, ill will, hatred, or malice against Short, or that what they did constituted the intentional doing of a harmful act, without just cause or excuse, or that there was any intention or purpose to destroy Short's business or drive him to financial ruin. There is nothing from which a motive to destroy Short's business may be deduced. There is nothing to indicate in what manner John Deere, or any of its agents and employees, could have benefited by such a consummation. It is evident that John Deere would best benefit by having a prosperous, successful dealer. The only rea-

1. Appellant does not complain of the action of the court in directing a verdict for John Deere on Count I.

sonable motivation of John Deere and its agents and employees would be to, encourage and assist Short and extend him credit as long as there was a reasonable prospect of his succeeding as a dealer. The evidence indicates that credit was extended. John Deere shipped goods to Short on a secured basis until June, 1961, to which time it had sold him $22,000 of goods for which he had not paid. Instead of closing him out at that time and canceling his contract, which it had a contractual right to do, John Deere permitted him to retain the goods on hand and to place further orders, requiring him, however, to take future deliveries on a C.O.D. basis. It was only after it was discovered in November, 1961 that Short's indebtedness to John Deere had been increased by an additional $21,000, and he had continued to fail to make remittances, that the relationship was terminated by John Deere. No submissible case of conspiracy or of malicious wrongdoing arises out of these facts.

■ Where the proof of conspiracy fails the complaining party may nevertheless prevail if the proof shows actionable conduct on the part of the wrongdoer, resulting in injury from which damages flow. Baucke v. Adams, 239 Mo.App. 84, 188 S.W.2d 355, 367. So we inquire whether the acts of the company's agents and employees, although not done in furtherance of a conspiracy, nevertheless amount to a tortious or wrongful destruction of Short's business; whether those acts violated some positive legal right or breached a legal duty owed Short, to his damage.

■ Short's first contention is that John Deere, through its agents and employees, caused, allowed and permitted I. L. Parks to make "the false and fraudulent representations referred to in paragraph 2 of Count I of this counterclaim." Short's cause of action for fraud, set forth in Count I, was dismissed by the court and Short failed to take a timely appeal from the order of dismissal. The only issue of fraud charged in Count II was the same issue of fraud set forth in Count I, which was dismissed by the court and consequently the issue of fraud became res judicata.

■ Short's contention that John Deere harassed him with lawsuits is not borne out by the record. The instant suit is the only litigation between the parties. No claim for malicious prosecution for the filing of this action could accrue to Short until this suit terminated in his favor, Zickel v. Knell, 357 Mo. 678, 210 S.W.2d 59, 60, 3 A.L.R.2d 1304, but both phases of this case terminated in judgments against Short. On the petition Short stipulated to the entry of judgment against himself and John Deere ultimately prevailed in the lower court on Short's counterclaim.

■ Short's other contentions are that John Deere, through its agents and employees, denied Short the "full cooperation" usually and customarily extended to incoming franchise dealers, and failed and refused (a) to grant cash loans to Short in reasonable amounts from time to time, (b) to offer, extend and grant to Short equipment loans in the usual and customary course of business, (c) to implement and follow the "finance plan" as it applied to Short, and (d) to make prompt and efficient delivery of its products and parts to Short.

The charge that John Deere failed in its obligation to extend "full cooperation" to Short as a dealer is too vague, indefinite and nebulous to provide the basis of a recovery in this action.

■ With respect to the charge that John Deere failed and refused to grant cash and equipment loans to Short, we find no positive legal right on the part of Short to require John Deere to do these things, and no basis upon which it can be said that in failing or refusing to do them John Deere breached any duty it owed Short. John Deere was under no *noncontractual* duty to grant cash loans or equipment loans to Short. The relationship of manufacturer and dealer did not, as such, without contractual reinforcement, impose any such

duties upon John Deere. It has not been demonstrated how the failure or refusal of John Deere to do these things amounted to tortious conduct on its part arising out of a breach of any recognized noncontractual legal duty. Nor was John Deere under any *contractual* obligation to grant cash loans or equipment loans to Short, either by the provisions of the three written contracts entered into by the parties, or as a result of I. L. Parks' gratuitous promise that John Deere would make a loan to Short. Short contends that I. L. Parks' statements that the company would make Short a loan resulted in a contractual obligation on the part of John Deere to make a loan, but such a promise would be unenforceable for uncertainty if for no other reason, since there was nothing said about the terms of the prospective loan—what amount, when the loan was to be made (except the vague reference to "in the spring"), the due date for repayment, security, etc. More importantly, Parks had no authority to make such a commitment on behalf of John Deere. Under the evidence the only person in the John Deere organization who had that authority was the vice-president and general manager. Nor do we find any basis for an estoppel to deny Parks' authority, as claimed.

Even if John Deere had contracted to make a loan and had breached the contract Short could not have recovered therefor in this action, which is not a claim of breach of contract, but of tortious misconduct. The violation of a contract will not, as such, furnish a basis for liability in tort. Lahtinen v. Continental Bldg. Co., 339 Mo. 438, 97 S.W.2d 102, 107 [4]. Out of the contractual obligation a separate obligation or duty must arise before liability in tort will attach, i. e., breach of contract may be treated as a tort only "where the law casts its separate obligation." Bishop, Non-Contract Law, 30, 31, §§ 73–76, quoted in Helm v. Inter-Insurance Exchange for Auto. Club, 354 Mo. 935, 192 S.W.2d 417, 420, 167 A.L.R. 238 [4]. Here there was no duty independent of contract to make loans,

and therefore a breach of a contract to make loans would not constitute a tort. ·

By the same reasoning Short could not recover in this tort action for breach of a contract obligation to reimburse Short for the cost of parts or for labor done under company warranties, or to follow the finance plan, or to make prompt and efficient deliveries.

As to the charge that John Deere failed to implement and follow its finance plan, we have seen that a substantial line of credit was actually extended to Short (to the extent of $22,000 by June and an additional $21,000 by November). Prior to June, 1961 John Deere would send Short goods ordered by him, but Short would not have to pay for the goods until he sold them to a customer, and until sold the goods would remain at the dealer's place of business. Short's complaint is that he was put on a C.O.D. basis in June. By the terms of the contract Short signed, Part IV, paragraph 17, John Deere had a right to take this action. That paragraph authorized John Deere to "make further deliveries only on a cash or C.O.D. basis" if the dealer failed to perform his contract [he did],or defaulted in the payment of any obligation due the company [he did], or if the company felt itself insecure in doing business with the dealer by reason of any event which in the company's judgment affected the dealer's financial or credit position [it did]. With Short far behind on remittances the company had every right to place Short on a C.O.D. basis. In addition to these considerations the contract gave the company the right to change or discontinue the finance plan "at any time without notice and without liability or obligation on its part."

With respect to the charge that John Deere did not make prompt and efficient deliveries, the evidence did not show what damages or loss of profits were sustained as a result of tardy deliveries or failures to deliver, and therefore there could have

been no basis for a judgment on this basis, in any event.

Finally, the denial of a recovery on Short's counterclaim must be sustained on the ground that Short introduced insufficient evidence from which the jury could have found that he sustained any net pecuniary loss or damage. Short testified that he invested a total of $79,130 in the business. The evidence indicates that all of the John Deere goods on hand when the sheriff levied under the writ of replevin were taken from Short, and the remainder of his property was sold in January, 1962. The business is "gone." But this is not the whole story, and Short fails to account for other facts in evidence. Short received goods having an inventory value of $75,000 when he purchased the assets and business of Elsberry Equipment Company, Inc. Thereafter he purchased and received from John Deere goods worth $190,000. Thus he had in possession a total of $265,000 worth of goods during the period in question. We are not advised how much of this was sold and paid for, how much was sold but not paid for and placed on the books, or the value of the goods remaining unsold at the time of the levy. If the unsold goods were worth $35,775, as the petition for replevin as amended alleges, this leaves more than $229,000 worth of goods the proceeds of which have not been accounted for by the evidence in this case. Did the disposition of the $229,000 plus worth of goods result in a profit or a loss? We do not know from this transcript. Nor are we informed what Short's total income and outgo was during the period of the operation; whether Short took any money or assets out of the business; or the amount of the accounts remaining on the books when Short went out of business, and whether these accounts were collected or collectible. Nor did the evidence show the amount received from the sale of the remaining assets on January 20, 1962. Business losses must be established with reasonable certainty in order to be recovered as damages. Proof alone of the amount that goes into a business and that the business failed is not sufficient to establish that that sum or any particular sum was lost in the operation of the business. There must also be proof of facts showing what amounts were *received* in the course of the operation, in order to establish net gain or loss. Income as well as outgo must be shown; it is the net that counts.

No error appearing, the judgment is affirmed.

COIL and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.