Archie D. ADKISON et ux., Appellants,

v.

Joseph W. HANNAH et al., Respondents.

No. 55369.

Supreme Court of Missouri,
Division No. 1.

Jan. 10, 1972.

Ward A. Dorsey, John G. Brannon, R. Brian Hall, North Kansas City, for appellants.

Bruce G. Heavner, Clifford N. Jarrett, Heavner, Jarrett & Kimball, Kansas City, for respondents.

WELBORN, Commissioner.

Action by mortgagees on redemption bond given by mortgagor upon foreclosure of deed of trust. Petition sought recovery of face amount of bond, $8,000, by Count I, and an additional $5,432.42, under Count II, for waste. Defendants counterclaimed, alleging that plaintiffs had conspired to destroy the business conducted on the mortgaged property in order to make it impossible for defendants to pay the mortgage so that plaintiffs might thereby regain the property. Counterclaim sought $50,000 actual damages and $100,000 punitive damages. Jury trial resulted in judgment of $8,000 in favor of plaintiffs on Count I of their petition and in favor of defendants on Count II of plaintiffs' petition. On defendants' counterclaim, verdict was for defendants for $10,000 actual and $15,000 punitive damages. Plaintiffs appeal.

Prior to May 17, 1961, plaintiffs-appellants, Archie D. Adkison and his wife, Mildred I. Adkison, were owners of a 100-acre tract of land in Platte County. They had a residence and operated a public swimming pool and two public fee fishing lakes on the property. On May 17, 1961, the Adkisons sold the property to William and Mary Jo Dunlap. The Adkisons received as down payment for the property a house valued at $12,500 and two notes for $3,500 each. They also received a note for $57,900, secured by a deed of trust on the property sold. The note was payable in

monthly installments of $400. The Dunlaps fell behind in their payments on the note and in March, 1963, they sold the property to the defendants-respondents, Joseph W. Hannah and his wife, Cleo C. Hannah. The Hannahs gave the Dunlaps property valued at $12,000, and assumed the mortgage held by the Adkisons.

The Hannahs became delinquent in their payments on the note and on November 24, 1965, the appellants notified them that, because of their defaults, the entire amount of the note had been declared due and payable. When the default continued, steps were undertaken to foreclose the deed of trust. A foreclosure sale was held on January 11, 1966. The Adkisons were the only bidders at the foreclosure and bid the property in for $27,500, which was what Archie Adkison figured the property was worth.

The Hannahs, upon filing notice of redemption and an $8,000 redemption bond, remained in possession of the property for one year. Upon their vacating the property, the Adkisons took possession of it and began this action on the redemption bond.

The petition alleged obligations involving interest, taxes, insurance and foreclosure sale expenses, covered by the redemption bond, amounting to $7,197.42. The petition also itemized numerous items of waste, totalling $6,235. Major items of waste alleged were removal of 33 walnut trees valued at $3,300 and damage to tile floors of $1,500. At the trial, plaintiffs' evidence showed items, other than waste, totalling $8,735.53, covered by the redemption bond. The two counts of plaintiffs' petition were submitted to the jury separately. The first count was for the interest, taxes, foreclosure expenses and waste and the second for waste alone. The verdict on Count I was for plaintiffs for $9,240 and on Count II for defendants. Judgment was entered for plaintiffs for $8,000 on Count I, the amount sued for on that count.

On this appeal, appellants contend that the trial court should have granted them a new trial on Count II of their petition because the defendants admitted acts of waste during the redemption period. Specifically they say that Joseph Hannah admitted selling $320 worth of walnut trees and that he had removed carpeting (which he had a right to do) which had been nailed to the floor.

■ Hannah's testimony does not show that plaintiffs are entitled to a new trial on Count II of their petition. Hannah admitted selling $320 worth of walnut trees. He did not admit that the damage caused by the sale of such trees was $3,300, as plaintiffs claimed. His testimony was that removal of the walnut trees was part of a clearing project which enhanced the value of the land. Hannah did not admit that the removal of the rugs damaged the floor. He admitted only that he removed them.

■ The issue of damages remained for the jury. The jury apparently did find that plaintiffs suffered damages for waste, in view of their verdict on Count I for $9,240. Plaintiffs, however, took no steps in the trial court to have the verdict corrected and made no objection to the entry of the $8,000 judgment on such verdict. No grounds for relief have been presented in this court.

On this appeal from the verdict and judgment in favor of defendants on their counterclaim, plaintiffs have advanced numerous grounds for reversal. They assert that there was no submissible case of a conspiracy to injure defendants' business.

■ The defendants' evidence, if believed by the jury, would have shown that the plaintiffs instigated harassing inspections by health authorities of the swimming pool facilities after the Hannahs purchased the property and that they told potential patrons that the pool had been closed by health authorities; that they told prospective patrons that the fishing lake had not been stocked; that they destroyed or induced others to destroy roadside signs showing the public the way to the proper-

ty; that they caused roofing tacks to be spread in the road, causing flat tires and discouraging persons from going to the property; that they harassed the defendants with repeated late night telephone calls. The plaintiffs denied that they engaged in such activities, but viewing defendants' evidence in its most favorable light, there was sufficient evidence to support the submission that the plaintiffs conspired to damage the defendants' business. The circumstances are sufficient to show, contrary to appellants' contention, the agreement or understanding between the appellants essential for a conspiracy. Contour Chair Lounge Co. v. Aljean Furniture Mfg. Co., Mo.App., 403 S.W.2d 922, 926–927[1–4], [5–7]; Sadler v. Schmidt, Mo. Sup., 263 S.W.2d 35, 40[10, 11].

■ In concluding that a submissible case was made, we have considered the deposition testimony of Norma Adkison offered by respondents. Appellants objected that there was not a sufficient showing of a situation, under § 492.400, RSMo 1969, V.A.M.S., Civil Rule 57.29, V.A.M.R., permitting the reading of the deposition. Plaintiffs had taken the deposition of the witness for discovery purposes on March 27, 1969. The witness stated that at that time she lived in North Kansas City. Her deposition testimony showed that the witness had moved frequently during the preceding three years, following her divorce from the Adkisons' son. She had lived in Jackson and Platte Counties in the meantime and had spent some time in the State of Kansas.

Her deposition was offered on the grounds that at the time of the trial, in October, 1969, she had gone to Kansas, and therefore her deposition was admissible under subparagraph (1) of § 492.400, subd. 2, supra, authorizing the use of a deposition upon a showing that " * * * the witness resides or is gone out of the state; * * *." The evidence relied upon to show such fact was testimony of the defendants that for four weeks prior to the trial, they got in touch with the witness by telephone at a "Kansas number."

In the circumstances of this case, we cannot say that the trial court's permission to use the deposition was an abuse of its discretion. Myers v. Karchmer, Mo.Sup., 313 S.W.2d 697, 701[1–3]. The frequency of changes of residence by the witness would justify the reception of her deposition upon a lesser showing than might otherwise be expected. See Francis v. Willits, Mo.App., 30 S.W.2d 203, 205–206[1].

We do find merit in appellants' point that there is no substantial evidence of damages which respondents claim to have sustained. According to Hannah, when he purchased the property, the fishing lakes were not filled because the dam had broken and the swimming pool was in bad condition because all of the "utilities" in the pool had frozen and burst. Hannah repaired the dam and stocked one of the lakes. He also put the swimming pool in operable condition and opened for business, apparently in the summer of 1963. There was no evidence of what Hannah spent in putting the place in shape. He testified that "we started out pretty good, and then we started having troubles." He told about the destruction of his signs, noting that: "If business was good they'd tear signs down. If business wasn't too good the sign would stay up. If we'd have quite a few coming in why then they'd start tearing signs down." He testified to frequent health department inspections, acknowledging that the inspector never shut the pool or even made any requirement. He testified about flat tires people had when they came to the place and about finding roofing tacks in the road, apparently during the first summer of his operation and also, to a lesser extent, the next summer.

According to Hannah, business got so bad that he went back to working in the construction business and during 1965, there was very little activity around the place because Hannah had given up on it

as a fishing lake and recreation center. With income from his construction work uncertain, Hannah fell behind in his payments on the deed of trust and foreclosure finally occurred.

Throughout the testimony of both Hannah and his wife there is not one word of evidence as to the income from their business or of their expenditures. In their brief here, respondents state:

"The appellants are absolutely correct in that there is no evidence of the volume of business done by the respondents, and no evidence of loss of business or loss of profits because it is not the respondents' contention that the conspiracy was aimed at that purpose. The appellants are well aware of the fact that it is well nigh, if not impossible, to prove loss of profits in a conspiracy case of this nature, and no attempt was made to do so. It was the theory of the respondents from the initial pleading until the submission to the jury that it was the intention of the appellants to deprive the respondents of their total business, including the real and personal property, and all facets thereof, and it was not their intent to cause the respondents, from time to time, some temporary loss of income or profits."

The defendants' submission on their counterclaim was that actions of plaintiffs were in furtherance of a "conspiracy to damage the business" of defendants. The record here fails to demonstrate in any manner the nature and extent of the damages to the defendants' business which the acts charged to plaintiffs caused. The defendants did not take over a going business. According to Hannah, he had considered buying the place in 1962 but "they'd had so much trouble up there my wife talked me out of it." When the Hannahs did purchase the place in 1963, extensive work was required to put it in operating condition. The only evidence of how the business was operating before the alleged harassment began was in Hannah's statement: "Well, we started out pretty good, and then we started having troubles."

However, proof that a certain amount was paid for the property and that its value at the time of the foreclosure of the deed of trust was less than the amount paid does not establish either a proper measure of damages or show that the loss upon the foreclosure was proximately related to the acts charged as improper interference with the business conducted on the property. See John Deere Company of St. Louis v. Short, Mo.Sup., 378 S.W.2d 496, 504[11, 12]. Assuming that the ultimate object of the conspiracy was to force the defendants into default under the deed of trust, the measure of damages for wrongful foreclosure of a deed of trust is "the difference between the reasonable market value of the property and the aggregate amount of the liens thereon at the date of the foreclosure sale." Edwards v. Smith, Mo.Sup., 322 S.W.2d 770, 777[8–10]. See Missouri Real Estate Syndicate v. Sims, 121 Mo.App. 156, 98 S.W. 783. Even if Adkison's statement that his bid at the foreclosure sale represented the value of the property at that time is sufficient to show the value of the property, there is no evidence of the amount then owed under the deed of trust. Therefore, there was no proper base, under the evidence, for any measure of damages on the theory that the foreclosure was the ultimate object of the conspiracy.

Equally lacking was evidence that the harassment of the plaintiffs was the cause of the defendants' inability to pay off the deed of trust. Hannah testified that he almost bought the business in 1962 but "they'd had so much trouble up there my wife talked me out of it." When they took over the property in 1963, it was not a going business and considerable amount of work was required to make it such. What income it produced when it finally became operable is not shown. Hannah testified: "Well, we started out pretty good and then we started having troubles." Whether "pretty good" meant that the place at first produced an income sufficient to enable the Hannahs to meet the requirement of

the deed of trust is left to conjecture and speculation. A recital of the actions charged to the plaintiffs, followed by the statement that "Business dropped down so bad there that I had to go to other stuff," does not prove that the bad state of the business was attributable to the plaintiffs' acts. Hannah himself testified that "fishing wasn't too good, the pay lakes were beginning to drop all over the country." He testified to troubles regarding the condition of the road to the lake which apparently affected his 4th of July business in 1963, but there was no evidence that plaintiffs were responsible for the condition of the road. Thus Hannah's own testimony strongly suggests that his difficulties were attributable to numerous factors, not necessarily limited to the actions of plaintiffs.

■ The defendants had the burden on their counterclaim of demonstrating damage attributable to the alleged conspiracy. Reger v. First National Bank, 221 Mo.App. 54, 279 S.W. 1053, 1058[9]. They were obliged to prove the items and amounts of pecuniary damage. Weaver v. Jordan, Mo.App., 362 S.W.2d 66, 75[6]. If, as they now assert, they are to rely upon the loss of the property upon foreclosure as the basis for their damage, they must demonstrate a relationship between the conspiracy and the foreclosure. The evidence fails to do so and therefore the judgment for the defendants cannot stand.

■ Inasmuch as in conspiracy actions the gist of the action is the damage inflicted (Shaltupsky v. Brown Shoe Co., 350 Mo. 831, 168 S.W.2d 1083, 1086[2, 3]), remand cannot be for trial on the issue of damages only. Additionally the issue of punitive damage must necessarily be viewed in the light of actual damage sustained. See Beggs v. Universal C.I.T. Credit Corporation, Mo.Sup., 409 S.W.2d 719, 724[8–13]. Retrial of the entire issue of liability and damage will be necessary.

Judgment affirmed on plaintiffs-appellants' cause of action. Judgment in favor of defendants-respondents on their counterclaim reversed and remanded.

HOUSER, C., concurs.

HIGGINS, C., not participating.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.