**DENNIS CHAPMAN TOYOTA, INC.,**
Plaintiff–Respondent,

v.

**BELLE STATE BANK,**
Defendant–Appellant.

No. 14750.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 6, 1988.

Motion for Rehearing and/or Transfer
Denied Sept. 26, 1988.

Application to Transfer Denied
Nov. 15, 1988.

Irl B. Baris, St. Louis, for defendant-appellant.

J. Kent Robinson, W.H. Thomas, Jr., Rolla, for plaintiff-respondent.

HOGAN, Judge.

Plaintiff Dennis Chapman Toyota, Inc., (hereinafter Chapman) brought this action against defendant Belle State Bank (the bank) averring, among other things, breach of an oral contract to loan money. Plaintiff has had a verdict and judgment based, for the most part, upon an expert's projection of plaintiff's future profits. The defendant asserted a counterclaim and by agreement of the parties, judgment in the amount of $71,249.66 was entered on the counterclaim. The bank has appealed. Ten (10) points and subpoints have been briefed. We reverse on the ground that Chapman failed to establish an enforceable oral contract to loan money. At least three separate but interrelated transactions are involved in the case and it is necessary to distinguish them in order to demonstrate the principles which control the appeal.

I

In the fall of 1980, plaintiff Dennis Chapman decided to purchase a Toyota dealership owned by one V.L. Long. The dealership was located in Rolla, Missouri, but the franchise included nine counties. Mr. Long agreed to sell the dealership for $260,000. In order to buy the business, Chapman was obliged to borrow money. He decided to try to obtain a loan through the Small Business Administration. Both the defendant bank and a bank at Bourbon were willing to participate in the financing, but the defendant bank offered a better interest rate. The SBA approved Chapman's application and the bank loaned Chapman $225,000 with which to purchase the Toyota dealership. Ninety percent of the loan was guaranteed by the SBA. The document issued by the SBA indicates that the total amount of the loan guaranteed was $225,-000 payable in monthly installments of $3,374 over a period of 10 years.

Toyota required Chapman to maintain a line of credit so he could stock, or "floor" new automobiles. For the Rolla market area, Toyota required a line of credit in the amount of $240,000. As Chapman de-

scribed this credit requirement, "We refer to it in the industry as an amount of money that would be on a guaranteed basis by the bank to purchase new cars as they were shipped from the manufacturer. The manufacturer would actually draft the bank and the funds would be paid internally." The bank agreed to extend Chapman a $300,000 line of credit. The letter of credit submitted to Toyota by the bank is before us as plaintiff's exhibit 7, and it reads as follows:

"This is to certify that [Dennis Chapman Toyota] has an established line of credit with us and you are hereby authorized to draw on this bank cash drafts, for payment of invoices covering Toyota motor vehicles shipped or delivered from territorial United States to said dealer in fulfillment of bona fide orders placed by said dealer with your company; said drafts to be drawn upon us payable as hereinbelow indicated for the amount of each invoice covering such motor vehicles shipped or delivered as aforesaid, provided, however, that the total aggregate amount of drafts drawn upon us in any one day does not exceed the sum of $300,000.00 and a maximum limit of $300,000.00.

We agree to pay, at par, said drafts upon presentation, provided that such drafts will be presented to Belle State Bank, no later than three days after shipment of vehicles to said dealer and further provided that, upon request, you will furnish to us additional vehicle identification and/or other documents of title.

Upon telephonic, telegraphic or written notice to you at the above address, we may withdraw or suspend this commitment with respect to subsequent shipment or delivery of vehicles to the above named dealer, effective forty-eight (48) hours following receipt of such notice. Telephonic, telegraphic notice will be confirmed by our letter.

This authorization is effective September 24, 1980, and supersedes prior authorizations, if any, whereby we have agreed to pay for motor vehicles delivered or shipped to above named dealer...."

Chapman "actually ... started doing business" on February 9, 1981, and at first his business went well. On May 18, 1981, however, the bank advised Toyota that:

"This letter supersedes the letter dated September 24, 1980, that was signed by Louis P. McClelland.

This is my authorization to cancel a letter of credit dated September 24, 1980, which had approved the shipment of Toyota Motor Vehicles to Dennis D. Chapman Toyota, Inc.

It was brought to my attention the language of the above reference [sic] letter constituted a letter of credit, and obligates our bank in the amount of $300,000.00 in addition to the outstanding debt of floor plan to Dennis D. Chapman Toyota, Inc.

You may also accept this letter as authorization to ship orders made by Dennis D. Chapman Toyota, Inc. as long as such orders do not exceed $300,000.00 cumulative total with the existing floor plan we now have.

EXAMPLE: The outstanding debt owed by Dennis D. Chapman Toyota, Inc., could be $260,000.00. That would leave an available balance of credit in the amount of $40,000.00. I would suggest that on any shipments, prior approval be made direct through our bank to avoid refusal of drafts in transit...."

This letter was followed by a similar letter dated May 22, 1981, and on July 7, 1981, the bank issued a second letter of credit in the amount of $120,000. The record indicates that the bank was obliged to reduce Chapman's line of credit because the total amount of credit the bank proposed to extend to Chapman would exceed the amount it was authorized to loan any individual person. The reduction in the line of credit, according to Chapman, had a negative impact on his business; his inventory of new automobiles was reduced by half and his profits "went down." Eventually, Chapman was able to obtain financing for his new automobiles from ITT Diversified Credit Corporation.

## II

The transaction with which we are specifically concerned is an alleged oral contract to loan money. Mr. Chapman testified that in September 1981, shortly before he obtained his "new car" financing from ITT, he discussed a used car "floor plan" with officers of the bank. Mr. Wicecarver—then president of the Bank—and Mr. Holmes, the bank's executive vice-president, met Chapman for lunch to discuss "business in general." Wicecarver advised Chapman that " 'We would love to continue to do business with you on used car flooring and certainly on the retail contracts that you've been sending us.' " Chapman explained that selling an automobile on a "retail contract" meant that the dealer took the responsibility to "put the paperwork together," submit the credit application to the bank, and thereafter "recourse the paper and send the paper to the bank." This meant that Chapman was actually referring customers to the bank. At this time, Wicecarver said the bank "would at least do up to a hundred thousand."

On October 15, 1981, Holmes called Chapman, stating that since ITT had agreed to finance a "new car floor plan" the bank would be interested in discussing the "used car floor plan." A meeting was arranged. At the meeting, officers of the bank "agreed to floor [Chapman's] late model [used] cars." The "models" included were all 1981, 1980 and 1979 used cars and 1978 Toyotas. The bank agreed to "extend" "[u]p to one hundred thousand dollars." Chapman was told to select average quality used automobiles for use as collateral. The value of a particular vehicle was to be established by using the National Automobile Dealer Association's (N.A.D.A.) used car value guide. Chapman was then to give the necessary information to his office manager who was to complete a financing form "with all the proper information, title, vehicle and date." Chapman would sign the note, affix the titles and send them to the bank. It is of considerable significance that the bank was to set the interest rate when the notes were received.

Chapman's further testimony was that when he sent the notes and financing forms forward from his office to the bank, the bank would "process the note and deposit the funds in our bank account there at the Belle State Bank." He further testified that on October 19, 1981, he decided to "floor" some used cars. Chapman "selected the cars, placed the value on them and turned that slip of paper in to [his] Office Manager." The office manager prepared a note or notes for "about" $20,000. One more note was sent to the bank for credit on October 21 in the amount of $9,000. Checks were thereafter written in anticipation that funds would be deposited to Chapman's account. Two checks were drawn, both made payable to ITT Diversified Credit Corporation. These checks were dishonored and this action followed.

In the "argument" part of the brief, Chapman concedes that the letter of credit "In no way [controls] any agreements entered into between the Plaintiff and the Defendant." Rather, as we understand Chapman's brief, it intended to submit an oral contract to loan money as its theory of liability and of course a party is held to his trial theory on appeal. *Morris v. Kansas City*, 391 S.W.2d 198, 200[4] (Mo.1965); *Gilliam v. Gohn*, 303 S.W.2d 101, 108[16] (Mo.1957); *State ex rel. Reynolds County v. Riden*, 621 S.W.2d 366, 368[1] (Mo.App. 1981). Therefore the dispositive issue on this appeal is whether the plaintiff made a submissible case on its pleaded and instructed theory. In deciding this point we are obliged to take that view of the evidence and all reasonable inferences therefrom which is favorable to the verdict, disregarding the defendant's evidence except that which supports the verdict. This rule is, however, subject to the qualification that every fact and element of the plaintiff's case must be submissible. *Bayne v. Jenkins*, 593 S.W.2d 519, 521 (Mo. banc 1980); *Haswell v. Liberty Mut. Ins. Co.*, 557 S.W.2d 628, 633 (Mo. banc 1977); *Kiphart v. Community Federal Savings & Loan Ass'n*, 729 S.W.2d 510, 515 (Mo.App. 1987).

## III

One or two general observations are appropriate before we address the merits. Basically, the case involves an emerging order of litigation which has been referred to as "lender liability." [1] Breach of a commitment to lend or to continue funding has been used as a theory of recovery. In some cases the plaintiff has averred breach of a special fiduciary duty of care. [2] In a few cases, e.g., *Shaughnessy v. Mark Twain State Bank*, 715 S.W.2d 944 (Mo. App.1986); *Rigby Corp. v. Boatmen's Bank and Trust Co.*, 713 S.W.2d 517 (Mo. App.1986), and *Centerre Bank of Kansas City v. Distributors, Inc.*, 705 S.W.2d 42 (Mo.App.1985), our courts have dealt with various aspects of "lender liability" but for the most part we have been remitted to the general law. For that reason, we do not extend the scope of our opinion beyond the facts presented.

Chapman pleaded several causes of action in general terms but, as we have already noted, submitted its case on breach of an oral contract to loan money. If we have not already made ourselves clear, we have set out the other transactions between the parties at some length simply to show that there was a continuing course of dealing between them which had nothing to do with the transaction sued upon. The guaranteed loan to Chapman requires little discussion. We have recited enough of the original letter of credit issued by the defendant bank to show that it is "an engagement by a bank or other person made at the request of a customer ... that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." Section 400.5–103(1)(a), RSMo 1986; *see also Easton Tire Co. v. Farmers & Merchants Bank*, 642 S.W.2d 396, 398–99[1–3] (Mo. App.1982). The letter is therefore a letter of credit within the scope of § 400.5–102, RSMo 1986. Section 400 5–104 requires

that a letter of credit be in writing and signed by the issuer and that any modification of the terms thereof be signed by the issuer or confirming bank. The second letter of credit issued by the bank is in substantially the same form as the first. Further, by their express terms, both letters are revocable. The beneficiary of a letter of credit may in some circumstances have an action for wrongful repudiation of the credit, [3] but this action has nothing to do with either of the letters of credit issued by the defendant bank.

## IV

In one sense, the substance of Chapman's complaint as submitted is that he had established a line of credit with the defendant bank and that the bank refused to disburse the funds it had agreed to loan. The term "line of credit" was defined in *Midatlantic Nat. Bank v. Commonwealth General, Ltd.*, 386 So.2d 31, 33 (Fla.Dist. Ct.App.1980), thus:

"A line of credit is a limit of credit to cover a series of transactions.... (Citations omitted). It does not impart upon the bank the legal responsibility to loan up to the limit or a responsibility of the lender to borrow up to the limit, but merely facilitates the easier extension of credit."

The Florida court also included with its decision a useful definition of a "line of credit" as a commercial term:

" 'Although definitions vary, it is useful for banks to distinguish lines of credit from commitments. A line of credit is a specified amount that can be borrowed from time to time and that can be cancelled by either party at any time. Every line carries a specific internal review date and is reviewed at least annually. *A commitment, on the other hand, is defined as an agreement signed by both borrower and lender for a specified amount and for a definite period—not*

---

1. For a recent topical discussion *see* S. Nickles, Lender Liability: Major Causes and Effective Cures (1988).

2. Blodgett, Lender Liability Still Lurking, A.B. A.J. May 1, 1988, at 42.

3. *See* N. Rubenstein, The Issuer's Rights and Obligations Under a Letter of Credit, 17 U.C.C. L.J. 129, 173 (1984).

*to be cancelled except under the conditions set forth in the agreement. Every commitment must have a stated expiration date. For this assurance of credit availability, the bank's customer pays a fee.* Whenever a credit line or commitment is in effect, a loan can be made any time thereafter at the request of the borrower.'" (Emphasis added.) *Midatlantic Nat. Bank v. Commonwealth General, Ltd.,* 386 So.2d at 33, n. 1. The Eastern District also utilized this definition —noting that there are others—in deciding *Shaughnessy v. Mark Twain State Bank,* 715 S.W.2d 944. In *Shaughnessy,* the court concluded that the plaintiff's line of credit was irrevocable because the plaintiff had paid a commitment fee when it established the line of credit. *Shaughnessy,* 715 S.W.2d at 954[5]. In the *Midatlantic* case it was considered important that no commitment fee was paid and no written agreements were made as to the terms of the line of credit. The Florida court held, as we read the decision, that the bank was under no obligation to completely fund the line of credit and could terminate it at any time. *Midatlantic Nat. Bank v. Commonwealth General, Ltd.,* 386 So.2d at 34.

As noted in the *Shaughnessy* case, there are other definitions of a "line of credit," e.g., that found in *Modoc Meat & Cattle Co. v. First State Bank of Oregon,* 271 Or. 276, 532 P.2d 21, 25 (1975), but in the cases we have examined involving a "line of credit" there has been some underlying enforceable contract to loan money. What has been at issue has been the lender's right to refuse disbursal. In this case, the decisive question is whether there was any enforceable contract to loan money between Chapman and the bank. If not, it is beside the point to discuss the bank's refusal to accept the used cars as collateral, deposit their value to Chapman's account and disburse the proceeds. *In re Red Cedar Const. Co., Inc.,* 63 B.R. 228, 237–38[1, 2] (Bkrtcy.W.D.Mich.1986).

The bank argues, without being precise, that the "alleged contracts" should have been in writing. Although an extended discussion of the point is unnecessary, we have the tentative opinion that a valid cause of action for breach of an oral contract to lend money is recognized at law. *See, e.g., Wait v. First Midwest Bank/Danville,* 142 Ill.App.3d 703, 96 Ill. Dec. 516, 521, 491 N.E.2d 795, 800 (1986). The focus of our concern in this case is whether Chapman proved a contract sufficiently definite to be enforced.

As a very general proposition, it may be said that although the parties may have had and manifested an intention to make a contract, if the content of their agreement is unduly uncertain and indefinite no contract is formed. J. Calamari and J. Perillo, Contracts § 2–13, p. 43 (2d ed. 1977). Our courts have applied this rule to contracts to loan money. In *John Deere Company of St. Louis v. Short,* 378 S.W.2d 496 (Mo. 1964), the defendant asserted by counterclaim that an employee of the plaintiff company had promised to make cash and equipment loans to him, principally on the basis that the plaintiff customarily made cash and equipment loans to incoming franchise dealers in reasonable amounts from time to time. The court rejected this argument, stating that:

"... such a promise would be unenforceable for uncertainty if for no other reason, since there was nothing said about the terms of the prospective loan— what amount, when the loan was to be made (except the vague reference to "in the spring"), the due date for repayment, security, etc....."

*John Deere Company of St. Louis v. Short,* 378 S.W.2d at 503.

In *Labor Discount Ct. v. State B. & T. Co.,* 526 S.W.2d 407 (Mo.App.1975), plaintiff sought to recover on the theory that six defendant banks had breached an oral agreement to furnish interim financing to complete the construction of a discount store. Among many other things, the trial court had to consider the validity of a promise to lend additional interim financing over and above that which had been committed in writing. The trial court found that plaintiff had failed to prove a contract of sufficiently definite terms to admit of enforcement. On appeal, our colleagues at St. Louis agreed, stating:

"The amount of the alleged promise for additional interim financing was the subject of inconsistent testimony by some of plaintiff's own witnesses, although one might conclude that the most likely figure was $500,000.00. There was not, however, any evidence as to due date, security, rate of interest, time for payment, etc. Taken alone, the absence of any one of these terms might not be of great significance; viewed collectively, however, their absence is fatal and the alleged promise was correctly found by the trial court to be too indefinite to admit of enforcement.... (Citations omitted)."

*Labor Discount Ct. v. State B. & T. Co.,* 526 S.W.2d at 425[24].

The courts of other jurisdictions have also considered the degree of definiteness requisite to a contract to extend a line of credit or to loan money. In *Willowood Condominium Ass'n, Inc. v. HNC Realty Co.,* 531 F.2d 1249 (5th Cir.1976), suit was brought alleging breach of a contract or commitment to make a loan. The alleged contract failed for several reasons. There were no specifications in two letters from a commercial lender as to how and when interest on a 4.7 million dollar loan would be adjusted or paid. The parties had agreed on a floating interest rate, but the interest provision was considered too vague to support the existence of a contract. The court noted ambiguity as to the disbursement and repayment of the principal. These omitted terms were deemed major and material. Applying Texas law, the court held that judgment had been properly entered for the defendant.

In *McErlean v. Union Nat. Bank of Chicago,* 90 Ill.App.3d 1141, 46 Ill.Dec. 406, 414 N.E.2d 128 (1980), a borrower brought an action against a commercial lender seeking, among other things, damages for breach of oral and written contracts to extend a line of credit, and for breach of a fiduciary relationship. The trial court dismissed the cause and the plaintiff appealed. Affirming the dismissal, the Illinois Court held:

" ... No elements of a contract cognizable in law or equity as to the essential terms of [a contract committing the lender to extend a line of credit] appear in the guaranty or elsewhere, nor are any such elements pleaded. *These terms would include, for example, the intended duration of the line of credit; the applicable rate of interest to be charged for any loan emanating from such an agreement, or the basis for how such interest would be ascertained; what duration or date or dates were contemplated for maturity of such loans; and what mode or rate of repayment was contemplated, i.e., whether the entire amount would be repayable or if repayment in installments would be acceptable ....*" (Emphasis added.)

*McErlean v. Union Nat. Bank of Chicago,* 90 Ill.App.3d 1141, 46 Ill.Dec. 406, 410, 414 N.E.2d at 132.

In *Malaker Corp., Etc. v. First Jersey Nat. Bank,* 163 N.J.Super. 463, 395 A.2d 222 (1978), *certification denied,* 79 N.J. 488, 401 A.2d 243 (1979), the New Jersey court held that a bank's alleged oral agreement to make an unrestricted line of credit available to a corporation for working capital purposes was unenforceable as a matter of law where there was no suggestion as to what rate of interest the loans would bear, what the terms of repayment of the loans would be, whether they would be repaid on demand or were to be given on time notes, whether they would be secured by collateral, and if so, what collateral could have been demanded, and how long the bank was to be obligated to honor the commitment. The court emphasized a basic principle we have already noted; an essential characteristic of an enforceable contract is that its obligations be specifically described in order to enable a court or trier of fact to ascertain what it was the promisor undertook to do. *Malaker Corp., Etc. v. First Jersey National Bank,* 163 N.J.Super. 463, 395 A.2d at 227[4]; 1 Williston, Contracts § 24 (Jaeger 3d ed. 1957). Our courts have stated the same principle in different contexts. *See Bengimina v. Allen,* 375 S.W.2d 199, 203[3, 4] (Mo.App.1964).

Further canvass of the authorities would be superfluous. Here, the defendant's argument that the alleged contract to finance the purchase and sale of used cars is too vague and uncertain to be enforced is well taken. In testifying to the oral agreement to "floor late model cars," Chapman testified that officers of the bank agreed to loan "[u]p to one hundred thousand dollars." We do not regard this as a definite amount or an amount determinable by reference to any criterion established by the evidence or ordinary business practices. The standards by which the value of the collateral were to be determined were somewhat more definite. Chapman was to select used automobiles which were of "'average N.A.D.A. ... loan value or less,'" but when Chapman was called upon to state how an "average value" would be ascertained, he answered only that "I would say specifically the miles on the car, the condition of the car—as opposed to where the windshield was broke or the tires are worn out. Certainly when you drove the car, you wouldn't want the engine to be rattling or noisy or the transmission to be loose. And so those were average things or above that we were looking for."

There was no concrete agreement concerning the rate of interest the bank would charge if it decided to loan money upon the collateral tendered. Promissory notes, with the titles attached, were sent forward to the bank and the bank "was to affix the interest rate per the time of the month that the note was executed." There was no evidence of the terms for repayment of the loans which the bank was to make in order to finance the used cars. There was evidence that if a note secured by a used car was not paid, the note would be "rolled" and a new due date would be established but no orderly method of repayment was shown by the evidence. The terms of plaintiff's purported contract were no more definite than those rejected in the cases we have cited. The intended duration of the line of credit was not established; the applicable rate of interest for any loan emanating from the agreement was not proved; the duration of the loans was not made definite by the evidence, nor was the rate or mode of repayment established. To reiterate, the oral contract sued upon was too indefinite to be enforced.

Chapman suggests that the ordinary rules of construction, applied to this agreement, make it sufficiently definite to be enforceable. We cannot agree. As this court held in *Johnston v. First Nat. Bank & Trust Co. of Joplin*, 624 S.W.2d 500, 502 (Mo.App.1981), we cannot make indefinite parts of a contract definite where there is no showing that a definite intention was present. The essential difficulty with Chapman's position in this court is that a mere recitation of the mechanical steps to be taken in securing a loan on its used cars does not establish the terms of the contract itself. The judgment on the plaintiff's claim must be reversed. It is so ordered.

PREWITT, P.J., and FLANIGAN and MAUS, JJ., concur.