Affirmed in Part and Dismissed in Part, and Majority and Concurring and
Dissenting Opinions filed April 17, 2008








Affirmed in Part and Dismissed in Part, and Majority and Concurring and Dissenting Opinions
filed April 17, 2008.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-05-01090-CV

_______________

 

ENVIRONMENTAL PROCEDURES, INC. and ADVANCED WIRECLOTH,
INC., Appellants

 

V.

 

GEORGE E. GUIDRY, DWIGHT W. ANDRUS, III, DWIGHT W.
ANDRUS INSURANCE, INC., and LEXINGTON INSURANCE CO., Appellees

                                                                                                                                             
  

On Appeal from the 164th District Court

Harris County, Texas

Trial Court Cause No. 03-49520

                                                                                                                                               


 

 M A J O R I T Y   O P I N I O N








This multi-issue appeal arises out of
a dispute between an insurance broker and his clients as a result of the
placement of comprehensive general liability insurance.  The insureds contend
the trial court erred in granting partial summary judgment in favor of the
insurance broker, the company that employed him, and the owner of that company
on the insureds= claims arising out of alleged negligence, negligent misrepresentation,
and violations of article 21.21 of the Texas Insurance Code.  The insureds
further assert that the trial court erred in directing a verdict on their
breach-of-fiduciary-duty claims.  In addition, the insureds argue that the
trial court erred by not rendering judgment in their favor based on their
claims under section 101.201 of the Texas Insurance Code.  The insureds also
argue that the trial court reversibly erred by excluding from evidence two
issues of a trade publication.  Finally, the insureds appeal the trial court=s order purporting to enjoin the
insureds and their counsel from further use or disclosure of certain
documents.  We conclude that the insureds= appellate issues lack merit and
affirm the trial court=s judgment. Additionally, we conclude that the trial court=s non-disclosure order was void from
the moment it was signed, and so we dismiss as moot the insureds= appeal from this order.  

                              I. 
Factual and Procedural Background

Appellant Environmental Procedures,
Inc. d/b/a Sweco Oilfield Services (AEPI@) operated as a tool rental and
oilfield service company; its subsidiary, appellant Advanced Wirecloth, Inc. (AWirecloth@) manufactured screens used in the
oil industry.  At the time of the events in question, the respective
headquarters for EPI and Wirecloth (hereinafter collectively the AInsureds@) were located in Texas.  The Insureds= insurance agent or broker was
appellee George Guidry, who was employed by appellee Dwight W. Andrus
Insurance, Inc. (the AAgency@) in Louisiana.  Appellee Dwight W. Andrus, III was the owner
of the Agency.  Guidry presented insurance proposals and presentations to the
Insureds in Texas and delivered the relevant policies or cover notes to the
Insureds in Texas.  Although Guidry sold surplus-lines insurance to the
Insureds, he was not licensed to do so in Texas.  

A.        The
Insurance Policies








In 1991, Guidry obtained insurance ,
effective October 1, 1991 through September 30, 1992, for the Insureds through
British-American Insurance Group Ltd. (ABritish American@).  The coverage consisted of a
comprehensive general liability (ACGL@) policy with a limit of $1 million
for any one accident or occurrence and an umbrella policy with a $3.5 million
limit for any one accident or occurrence.  The 1991 British American coverage
for the CGL policy was apportioned among seven insurers, and the responsibility
for the coverage limits under the umbrella policy was shared among 28
insurers.  Guidry provided the Insureds with  cover notes reflecting this
coverage.

In November 1992, Guidry renewed the
coverage on the British American CGL policy.  He provided the Insureds with a
cover note showing that this coverage was divided among three insurers.  A few
weeks later, British American sent cover notes to the Agency showing excess CGL
coverage for the Insureds apportioned among eleven insurers and $5 million in
umbrella coverage provided by Ocean Marine Indemnity Company Limited.  These
policies were effective from October 1, 1992 through September 30, 1993.

In 1993 and 1994, Guidry obtained the
Insureds= CGL and umbrella insurance from
Lexington Insurance Company.  Under the terms of the Lexington policies, the
limits of coverage were reduced by the costs of defense.

B.        The Underlying Litigation

In the summer of 1994, Wirecloth
notified Guidry that it had been sued by a competitor, Derrick Manufacturing
Corporation, who had alleged various patent and trademark violations, as well
as other violations of Texas common law and the Texas Business and Commerce
Code.  Guidry forwarded this information to British American.  In the summer of
1995, the Insureds, among others, again were sued by this competitor for
similar alleged violations of a second patent.  These lawsuits were
subsequently consolidated. The Insureds notified Guidry of the second suit, and
Guidry forwarded the information to Lexington.  Lexington appointed defense
counsel under a reservation of rights in April 1996, but the Insureds continued
to pay most of their own defense costs.








In September 2001, Varco, L.P., a
subsidiary of National Oilwell Varco, a successor in interest to the Insureds,[1]
paid approximately $15 million to settle the Derrick litigation.  By this time,
the Insureds and their successors-in-interest had incurred approximately $17
million in attorneys= fees.  Lexington paid a fraction of the Insureds= defense costs, but did not
contribute funds to settle the Derrick litigation. 

Within a week of the settlement,
Lexington filed a declaratory judgment action against the Insureds seeking a
coverage determination (the ACoverage Suit@).  Additional insurers were later added to the suit.[2] 
The Insureds and their successors reached a number of settlement agreements
with  British American and with many of the insurers.  Regarding the coverage
procured through British American, there were no settlements with the insurers
securing the 1991B1992 CGL and umbrella policies, but the Insureds and their
successors settled with all of the insurers providing coverage under the 1992B1993 CGL and umbrella policies. 
Between these two extremes, the Insureds reached settlement agreements with
some, but not all, of the insurers securing the 1992B1993 excess CGL policy.  The Insureds
settled their claims with Lexington in the Coverage Suit at the same time as
they settled the claims that they had asserted against Lexington in this suit. 


C.        This
Suit








The Insureds filed the instant suit
against Guidry, the Agency, and Andrus (hereinafter collectively the ABrokers@) on August 29, 2003 (the AFiling Date@), asserting claims against the
Brokers for negligence, gross negligence, negligent misrepresentation, fraud,
breach of fiduciary duty, and violations of article 21.21 of the Texas
Insurance Code.  The Insureds also asserted claims under section 101.201 of the
Texas Insurance Code (hereinafter AUnauthorized Insurance Claims@), alleging that British American was
an Aunauthorized insurer,@ that the Brokers assisted in the
procurement of the British American policies, and that therefore the Brokers
were liable for the unpaid amount of the claims due under the terms of the
British American policies.  In addition, the Insureds alleged that Andrus
negligently supervised Guidry, that Andrus operated the Agency as a sham to
perpetrate a fraud, and that the Agency was Andrus=s alter ego.  The Insureds invoked
the discovery rule and the doctrine of estoppel, alleging that they first
learned of the misconduct when Guidry=s deposition was taken in the
Coverage Suit.  

Partial Summary
Judgment

The Brokers filed a motion for
partial summary judgment based on a limitations defense.  In their motion, the
Brokers asserted that the Insureds= claims for negligence,[3]
negligent supervision,[4] negligent
misrepresentation,[5] and
violations of article 21.21 of the Texas Insurance Code were barred by the
two-year statute of limitations.[6]  The Insureds
responded and filed special exceptions. The motion was set for submission
without oral argument.  Less than two weeks before the submission date, the
Brokers filed a reply accompanied by additional evidence, and less than a week
later, the Insureds filed a surreply, objections, and a motion to strike the
additional evidence based on untimeliness.  More than five weeks later, the
trial court denied the Insureds= motion to strike and granted the Brokers= motion for partial summary judgment,
without specifying the basis for its ruling.

Non-Disclosure Order








A few days before the trial court
granted partial summary judgment, Lexington filed a AMotion to Enforce Confidentiality
Agreement and for Entry of Protective Order.@ No evidentiary hearing was held, and
the trial court signed an order granting the motion on April 5, 2005
(hereinafter the A Non-Disclosure Order@), barring the Insureds, their
attorneys, and additional non-parties from using or disclosing, in this case or
in any other proceeding, certain depositions and personnel files collected in
the Coverage Suit.  The Non-Disclosure Order was not severed from this case. 

Trial and Judgment

About a month after entry of the
Non-Disclosure Order, the case was tried to a jury.  As a defense to the
Unauthorized Insurance Claims, the Brokers asserted that the insurance in
question had been independently procured.  Before the case was submitted to the
jury, the trial court granted the Brokers= motion for directed verdict as to
the Insureds= breach-of-fiduciary-duty claims. The jury returned a verdict in favor of
the Brokers as to the Insureds= claims of fraud by misrepresentation and fraud by
nondisclosure.  The jury also found that the 1991 and 1992 British American
cover notes were independently procured.  In the jury charge, the trial court
had instructed the jury not to answer any more questions regarding the Insureds= Unauthorized Insurance Claims if the
jury found that these cover notes were independently procured.  Because the
jury made these findings, the jury did not answer any other questions regarding
the Insureds= Unauthorized Insurance Claims.  The trial court rendered judgment on the
verdict, denying the Insureds= motions for judgment notwithstanding the verdict and for new
trial. 

                                         II.  Issues and Analysis

On appeal, the Insureds present six
compound issues in which they challenge the partial summary judgment as well as
the trial court=s rulings on the admissibility of two issues of a trade
publication and the Brokers= motion for directed verdict. The Insureds also challenge the
Non-Disclosure Order and the trial court=s failure to render judgment against
the Brokers as to liability on the Unauthorized Insurance Claims.

A.        Did the trial court err in granting the Brokers= motion for partial summary judgment?








In a traditional
motion for summary judgment, if the movant=s motion and summary-judgment evidence facially establish its
right to judgment as a matter of law, the burden shifts to the nonmovant to
raise a genuine, material fact issue sufficient to defeat summary judgment.  M.D.
Anderson Hosp. & Tumor Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000). In our de novo
review of a trial court=s summary judgment, we consider all the
evidence in the light most favorable to the nonmovant, crediting evidence
favorable to the nonmovant if reasonable jurors could, and disregarding
contrary evidence unless reasonable jurors could not.  Mack Trucks, Inc. v.
Tamez, 206 S.W.3d 572, 582 (Tex. 2006).  The evidence raises a genuine issue of fact if
reasonable and fair-minded jurors could differ in their conclusions in light of
all of the summary-judgment evidence.  Goodyear Tire & Rubber Co. v.
Mayes, 236 S.W.3d 754, 755 (Tex. 2007).  When, as in this case, the order
granting summary judgment does not specify the grounds upon which the trial
court relied, we must affirm the summary judgment if any of the independent
summary-judgment grounds is meritorious.  FM Props. Operating Co. v. City of
Austin, 22 S.W.3d 868, 872 (Tex. 2000).  

Challenged Claims

At the time the Brokers moved for
partial summary judgment, the Insureds= live pleading contained claims of
negligence based on the following allegations: 

(a)       The Brokers failed to promptly notify
insurers of the Derrick suit.

 

(b)       The Brokers placed coverage with financially
unsound insurers and insurers with unsound management.

 

(c)       The Brokers placed coverage with insurers
that were non-existent, corrupt, or engaged in criminal misconduct.

 

(d)       The Brokers failed to disclose their
knowledge of the insurers= insolvency and corruption.

 

(e)       The Brokers sold insurance to the Insureds
without a Texas license. 

 

(f)        The Brokers sold surplus-lines insurance
without the required surplus-lines insurance license and without complying with
governing laws.

 

(g)       The Brokers failed to understand the defects
in the insuring contracts and insuring entities or sold the policies without
disclosing these defects.

 

(h)       The
Brokers negligently failed to secure better, available insurance.  








The Insureds also claimed the Brokers
negligently and falsely represented that they were obtaining the best possible
insurance at the lowest possible price, falsely represented terms and
conditions of the insurance they procured, and failed to disclose material
terms of the insurance coverage.  All of the foregoing claims were asserted
under both the common law and article 21.21 of the Texas Insurance Code.[7]

Appellate Arguments

In their first issue, the Insureds
challenge the partial summary judgment on the grounds that (a) in their motion
for partial summary judgment based on statute of limitations, the Brokers did
not address the 1991 and 1992 placements; (b) limitations on the claims
regarding the 1993 and 1994 placements did not begin to run until the Insureds
suffered a legal injury, which they claim did not occur until Lexington denied
coverage or until the Insureds became liable to pay a settlement in excess of
policy limits, both of which occurred within two years before this lawsuit was
filed; and (c) the Brokers did not offer any summary-judgment evidence
establishing that the Insureds knew or should have known of the Brokers= violations of article 21.21 of the
Insurance Code more than two years before they filed suit. 

Scope of Summary Judgment

In their first sub-issue, the
Insureds argue that the Brokers asserted only one ground in the motionCthat the statute of limitations had
run as to the Insureds= claims involving placement of the Lexington policies in 1993
and 1994.  In their motion, the Brokers asserted that the two-year statute of
limitations bars the Insureds= claims for negligence, negligent supervision, negligent
misrepresentation, and alleged violations of article 21.21 of the Insurance
Code.  The Brokers did not limit their summary-judgment ground to the Insureds= claims involving placement of the
Lexington policies.  Therefore, the Insureds= first sub-issue lacks merit.








Evidence Attached to the Brokers= Summary Judgment Reply

The Insureds assert on appeal that
this court cannot consider the summary-judgment evidence attached to the
Brokers= summary-judgment reply because (1)
this evidence was allegedly untimely and (2) the trial court never granted the
Brokers leave to file this evidence late.  Although the trial court never
granted leave to file the evidence late, the record reveals that no leave was
necessary because the Brokers filed the evidence more than 21 days before the
March 18, 2005 submission date.

The record reflects the following
chronology regarding the Brokers= summary-judgment motion:

!         November 10, 2004 C The Brokers file the motion for summary judgment. 

 

!         The motion is set for hearing on December 13,
2004. 

 

!         The motion is re-set, to be submitted to the
court without oral argument on February 7, 2005.[8]

 

!         January 26, 2005 C The Brokers file their reply with attached evidence.

 








!         January 31, 2005 C The Insureds file a motion to strike the evidence
attached to the reply as untimely because it was not filed 21 days before the
submission date.  The Insureds also file a motion to strike the Brokers= summary-judgment motions because they had been set
for submission after the deadline in the docket control order.

 

!         February 9, 2005 C The trial court denies the Insureds= motion to strike the Brokers= summary-judgment motions. 

 

!         At some point between February 9, 2005 and
March 18, 2005, the trial court re-sets the motion for submission on March 18,
2005, without oral argument.

 

!         March 18, 2005 C During a status conference in open court, the trial  judge
announces that she has denied a group of motions, and this group includes the
Insureds= motion to strike as untimely the
evidence attached to the Brokers= reply.[9]
The trial judge further states that she had set the Brokers= summary-judgment motion for
submission on March 18, 2005, and that counsel knew about this setting.  No
party challenges this statement, states that the court did not re-set the
submission date, or expresses surprise or lack of awareness that the trial
court had set the motion for submission on that date.[10] 
The trial court also announces that it is granting the motion.  The Insureds= counsel complains that the evidence
attached to the reply had been on file for less than ten days before the
submission date for the motion.  The trial court responds by noting that the
court set the motion for submission on March 18, 2005, which is more than 21
days after the reply was filed.








Except on leave of court, a movant is
required to file and serve summary-judgment evidence at least 21 days before
the time specified for the motion to be submitted to the trial court for
decision.  See Tex. R. Civ. P. 166a(c);
Martin v. Martin, Martin & Richards, Inc., 989 S.W.2d 357, 359 (Tex.
1998).  Though the trial court did not grant the Brokers leave to file the
evidence attached to the reply, it did not need to do so because the trial
court took an action that made the evidence in question timely filedCit specified March 18, 2005 as the
submission date for the motion.  See Dalehite v. Nauta, 79 S.W.3d 243,
245 (Tex. App.CHouston [14th Dist.] 2002, pet. denied) (holding that evidence filed less
than 21 days before original summary-judgment hearing was timely, even though
trial court never granted leave to file late evidence, because the
summary-judgment hearing was re-set to a date more than 21 days after the
evidence was filed); Thomas v. Medical Arts Hosp. of Texarkana, 920
S.W.2d 815, 818 (Tex. App.CTexarkana 1996, pet denied) (holding that trial court=s re-setting of hearing date for
motion for summary judgment made timely summary-judgment evidence that had been
untimely based on hearing date in effect when the evidence was filed and
served).  Thus, the timeliness of the evidence was no longer an issue.








The Insureds assert that at the
hearing on their motion to reconsider the partial summary judgment, the trial
court stated it had not considered the evidence in the reply.  However, at this
hearing the trial court actually stated, AI=m not going to consider the statute
of limitations arguments that were in your reply.@[11] This statement was simply an
acknowledgment by the trial judge that the trial court could not grant summary
judgment based on the grounds stated in the reply, because grounds must be
stated in the motion.  See McConnell v. Southside Indep. Sch. Dist., 858
S.W.2d 337,  341 (Tex. 1993).  The trial court  did not make this statement on
March 18, 2005, when the Insureds reminded the trial court that the reply
evidence had not been on file for 21 days before February 7, 2005; rather, the
trial court made this statement at a hearing on the Insureds= motion to reconsider the summary
judgment, a motion the trial court denied.[12] 
The trial court did not state that it had not considered the evidence attached
to the reply.[13]  








If, as in this case, the trial court
exercises its discretion to re-set the submission date for a motion for summary
judgment, the movants= summary-judgment evidence must be on file and served at
least 21 days before the new submission date.  See Dalehite, 79 S.W.3d
at 245; Thomas, 920 S.W.2d at 818.  Because the Brokers filed and served
the evidence attached to their summary-judgment reply more than 21 days before
March 18, 2005, that evidence was timely.[14] 
See Dalehite, 79 S.W.3d at 245; Thomas, 920 S.W.2d at 818.  And
because this evidence was timely, no presumption arose that the trial court did
not consider the evidence.  Thus, it was unnecessary for the Brokers to obtain
leave of court to file evidence late.[15]

The Insureds did not controvert the
evidence attached to the Brokers= reply, which showed, among other
things, the following: 

!                  
On July 20, 1993, the Insureds
submitted to the Andrus Defendants a listing of attorneys= fees for which they were seeking reimbursement under
the CGL policies brokered by British American.  The Insureds were seeking
reimbursement of attorneys= fees incurred
in connection with the Derrick claim. 

 

!                  
On or about July 15, 1994, Derrick
filed a patent infringement suit arising out of the 421 patent against
Wirecloth.  The suit involves patent and trademark infringement activities by
Wirecloth which allegedly began in 1993.

 

!                  
The Andrus Defendants submitted a
bid for the renewal of the Insureds=
coverage for the 1994B1995 period.  The Insureds accepted the bid which
included another written proposal submitted by the Agency.  That proposal
stated that defense costs were within limits.

 








!                  
On or about October 5, 1994, the
law firm of Maginnis & Picou, on behalf of the London Underwriters for the
primary CGL coverage for the 1992B1993
policy, wrote a letter to Wirecloth, stating that the underwriters were
investigating the 1994 Derrick lawsuit to determine if they had any duty to
defend and indemnify as to this lawsuit.  The underwriters stated that they
would not pay any amount of costs or attorneys= fees until they determined their obligation, if any, to indemnify
Wirecloth regarding this matter.  

 

!                  
On or about August 11, 1995,
Robert Holman of Technical Risks, Inc. conducted an insurance review for the
Insureds.  In reviewing the existing CGL coverage, he noted: AThe second area of concern is that defense costs are
part of the limit.  Not only does this reduce your >per occurrence=
limit; it also reduces your aggregate.@

 

!                  
On or about November 13, 1995,
Cynthia Fountain of Lexington Insurance Company wrote the Insureds advising
that Lexington denied coverage and would not defend or indemnify the Insureds
regarding Derrick=s 1995 lawsuit against the Insureds. 

 

!                  
On or about February 27, 1996, the
Insureds forwarded to Guidry a summary of invoices for attorneys= fees broken down by claims.  Guidry forwarded the
summary to the various insurers.  The Insureds had forwarded invoices for
Derrick defense costs and attorneys=
fees to the insurers in September of 1995, seeking reimbursement for the
Insureds= payment of these invoices.  However, no payment was
forthcoming as of the end of February 1996.

 

!                  
On or about March 8, 1996, attorney
Steve Borgman of Vinson & Elkins sent the Insureds an insurance coverage
analysis he had prepared.  The Insureds invoked privilege and refused to
produce this document in discovery.  

 

!                  
On or about March 12, 1996,
Borgman (Vinson & Elkins) wrote to Fountain (Lexington) regarding a
potential $6 million settlement of the two Derrick lawsuits that could occur
between the Insureds and Derrick.  Borgman also noted that to this point
Lexington had denied coverage and had refused to provide a defense.  Borgman
argued that Derrick=s claims were covered by the Lexington policies.  In
their petition, the Insureds allege that the failure to settle the case at this
point was proximately caused by the Brokers=
tortious conduct.  

 

!                  
On or about April 29, 1996,
Lexington wrote the Insureds stating that Lexington would now provide defense
counsel for the Insureds in the consolidated Derrick lawsuits under a complete
reservation of rights.

 








!                  
On March 11, 1997, Anglo American
Insurance Company went into a Scheme of Arrangement (the English equivalent of
bankruptcy).  Anglo American was responsible for 75% of the $100,000 primary
CGL insurance for the 1992B1993 policy
period.

 

!                  
On or about March 17, 1997,
Lexington issued another reservation-of-rights letter.

 

!                  
On or about May 28, 1998, James
Cornell, an attorney with Haynes & Boone who was representing the Insureds,
wrote to Fountain (Lexington).  Cornell stated that Lexington=s reservation of rights created a conflict of interest
and entitled the Insureds to select their own defense counsel.  Cornell stated
that the Insureds have continued to pay Vinson & Elkins to defend them in
the Derrick litigation, and that the Insureds were seeking reimbursement for
their legal expenses in defending against Derrick=s claims.   

 

!                  
On June 12, 1998, an attorney for
some of the underwriters advised Cornell (Haynes & Boone) of Anglo American=s Scheme of Arrangement (bankruptcy proceeding) in
England.  As of June 12, 1998, the London Underwriters for the primary CGL
coverage for the 1992B1993 policy still had not stated their position in
writing to Cornell regarding their defense and indemnity obligations.

 

!                  
On May 12, 1999, Chester Makowski,
an attorney with Royston Rayzor, Vickery & Williams wrote to Cornell
(Haynes & Boone) and advised that Lexington would pay only two-thirds of
defense costs based on the time of the risk and tendered a check for
$181,079.12.  Cornell was reminded that defense costs reduced the limits under
the primary policies issued by Lexington.  As of May 1999, a substantial amount
of attorneys= fees and expenses had not been paid.

 

!                  
On August 23, 1999, Lexington,
through Fountain, issued another reservation-of-rights letter to the Insureds,
noting that defense costs reduced the applicable limits of insurance under both
Lexington primary CGL policies.

 








!                  
In the Insureds= answer in the Coverage Suit, they stated that they
had incurred more than $17 million in attorneys= fees and expenses defending the Derrick litigation and that through
November 19, 2001, Lexington had reimbursed the Insureds less than $330,000, in
payments made in 1999.  The Insureds stated that the underwriters on the 1991
and 1992 policies had reimbursed the Insureds less than $365,000 of the more
than $17 million in attorneys= fees and
expenses.  

 

Limitations as a Bar to the Insureds= Claims: Did the Insureds suffer a
legal injury more than two years before they filed suit?

In their second sub-issue, the
Insureds assert that limitations on the claims regarding the 1993 and 1994
placements did not begin to run until the Insureds suffered a legal injury,
which the Insureds assert did not occur until Lexington denied coverage or
until the Insureds became liable to pay a settlement in excess of policy
limits.  

The Insureds alleged, in part, that
the Brokers engaged in the following Atortious conduct@:

!         failing to promptly notify insurers of
Derrick=s claim in the early summer of 1994;

 

!         placing coverage with financially unsound
insurers and insurers whose management was unsound;

 

!         placing coverage with non-existent insurers,
insurers who had ceased doing business, or insurers who were corrupt and
engaged in criminal misconduct;

 

!         failing to disclose to the Insureds the
Brokers= knowledge of the insolvency and corruption of the
insurers with whom the coverage had been placed;

 

!         selling insurance to Texans without a Texas
license;

 

!         selling surplus-lines insurance without a
surplus-lines license and without compliance with the surplus-lines laws;

 

!         failing to understand the defects in the
insuring contracts and insuring entities, or, alternatively, knowing of the
defects, and selling the policies without disclosure;

 

!         negligently failing to secure better,
available insurance;








!         falsely representing that ASovereign@
had insured the Insureds when it had not;

 

!         falsely representing that they were obtaining
the best possible insurance at the lowest possible price, when in fact they
were not; and

 

!         falsely representing terms and conditions of insurance and
failing to disclose material terms of the insurance prior to binding the
insurance.[16]

The statute of
limitations does not begin to run until a claim accrues.  S.V. v. R.V.,
933 S.W.2d 1, 4 (Tex. 1996).  Generally, a claim accrues when a wrongful act
causes some legal injury, even if the fact of injury is not discovered until
later, and even if all resulting damages have not yet occurred.  Id.; Moreno
v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990) (stating that Aa cause of action
can generally be said to accrue when the wrongful act effects an injury@).  When a claim accrues is a question of
law for the court.  Loyd v. ECO Resources, Inc., 956 S.W.2d 110, 126
(Tex. App.CHouston [14th Dist.] 1997, no pet.).

The Insureds argue that this court=s precedent in Mauskar v.
Hardgrove does not apply to this case.  See No. 14-02-00756-CV, 2003
WL 21403464, at *2B3 (Tex. App.CHouston [14th Dist.] June 19, 2003, no pet.) (mem. op.)
(holding claims for negligent procurement of insurance accrued on date the
insured purchased the insurance policies).  At a minimum, Mauskar
applies to the Insureds= claims for negligence and negligent misrepresentation
regarding the terms and conditions of the insurance policies, including the
term under which defense costs would reduce the applicable limits of insurance
as to the 1993 and 1994 policies. See Mauskar, 2003 WL 21403464, at *2B3.  Therefore, the summary-judgment
evidence conclusively proved these claims were time-barred by the  two-year
statute of limitations when the Insureds filed suit in 2003.








As to the other claims regarding the
1993 and 1994 placements, the Insureds argue in their second sub-issue that the
claims did not accrue until the Insureds suffered a legal injury, which they
claim did not occur until Lexington filed its declaratory-judgment against the
Insureds or until the Insureds settled the Derrick suit.  In support of this
contention, the Insureds cite a case decided by the First Court of Appeals.  See
All-Tex Roofing, Inc. v. Greenwood Ins. Group, Inc., 73 S.W.3d 412, 414B17 (Tex. App.CHouston [1st Dist.] 2002, pet.
denied).  However, in that case there was no allegation that the insured was
damaged by a failure to provide a defense or to pay defense costs.  See id. 
The insured only alleged damage based on a failure to indemnify against a
judgment.  See id.  In this case, the Brokers  submitted undisputed
summary-judgment evidence conclusively proving that on or about November 13,
1995, Lexington denied coverage, both as to defense and indemnity.  More than
five months later, on or about April 29, 1996, Lexington wrote the Insureds
stating that Lexington would provide defense counsel for the Insureds in the
consolidated Derrick lawsuits under a complete reservation of rights.  However,
even after April 29, 1996, the Insureds continued to pay their retained defense
counsel, and they did not accept the services of the counsel that Lexington
offered to provide at Lexington=s expense.  Under the Insureds= allegations and the uncontroverted
summary-judgment evidence, the Insureds paid their own defense counsel millions
of dollars in attorneys= fees prior to August 29, 2001, two years before the Filing
Date.  Despite the Insureds= requests for reimbursement, Lexington reimbursed the
Insureds less than $330,000 of their defense costs, and did not make any
reimbursement payments until 1999.  








Because Lexington  denied  coverage
and the Insureds allegedly incurred millions of dollars in damages, sufficient
facts existed for the Insureds to seek a judicial remedy based on their claims
for negligence and negligent-misrepresentation and their claims for violations
of article 21.212 of the Texas Insurance Code.  See Abe=s Colony Club, Inc. v. C & W
Underwriters, Inc.,
852 S.W.2d 86, 90B91 (Tex. App.CFort Worth 1993, writ denied) (holding that cases in which
only issue was liability above the policy limits were not on point in case in
which insured sought damages for expenses it incurred in defending third-party
claims, and that such damages constitute legal injury resulting in accrual of
claim and starting of limitations).  Therefore, the Insureds= second sub-issue lacks merit.

Did the evidence conclusively prove
that the statute of limitations bars the Texas Insurance Code claims?








In their third sub-issue, the Insureds assert that the
summary-judgment evidence does not conclusively prove that the statute of
limitations bars their claims for violations of the Insurance Code.  The
Insureds allege that the Brokers violated subsections (2),[17]
(5),[18] and (11)[19]
of section 4 of former article 21.21 of the Texas Insurance Code.  In summary,
the Insureds allege that they sustained actual damages caused by the Brokers= alleged (a) untrue, deceptive, or misleading
statements with respect to the business of insurance or with respect to any
person in the conduct of his insurance business, (b) false statements of
financial condition of an insurer made with intent to deceive, and (c)
misrepresentation regarding insurance policies.  The following is a summary of
the Insureds= allegations regarding this conduct:

!         The Brokers falsely represented their
competence and efforts.

 

!         The Brokers concealed the true state of
affairs about Lexington, British American, and other underwriters to continue
getting the Insureds= business and avoid getting sued.

 

!         The Brokers failed to disclose to the
Insureds the Brokers= knowledge of the insolvency and corruption of the
insurers with whom the coverage had been placed.

 

!         The Brokers failed to understand the defects
in the insuring contracts and insuring entities, or, alternatively, knew of the
defects, and sold the policies without disclosure.

 

!         The Brokers falsely represented that ASovereign@
had insured the Insureds when it had not.

 

!         The Brokers falsely represented that they
were obtaining the best possible insurance at the lowest possible price, when,
in fact, they were not.

 

!         The Brokers falsely represented terms and
conditions of insurance and failed to disclose material terms of the insurance
prior to binding the insurance.

 

!         As regards the Amiddle note@ sold in October 1992, the Brokers falsely represented
the identity of certain insurers and represented that certain insurers were
bound when they were not.

 

!         The Brokers failed to disclose that the notes sold through
British American were not protected by the guaranty funds of either Louisiana
or Texas. 








Suit on such claims must be commenced
Awithin two years after the date on
which the . . . unfair or deceptive act or practice occurred or within two
years after the person bringing the action discovered or, in the exercise of reasonable
diligence, should have discovered the occurrence of the . . . unfair or
deceptive act or practice.@  Tex. Ins. Code Ann.
art. 21.21, ' 16(d).  The evidence shows that the Insureds were defendants in major
patent and trademark litigation in federal court starting in 1994.  As of
August 29, 2001, the Insureds had been involved in this litigation for more
than seven years.  Despite the Insureds= payment of insurance premiums on
various policies for the 1991 to 1994 period, their insurers had not provided
them with a defense in the litigation, had not admitted that the policies
provided any coverage, and had reimbursed the Insureds for only a small
percentage of the millions of dollars that the Insureds had spent in defense
costs.  The Insureds had received an insurance review report from Technical
Risks, Inc. discussing various weaknesses in their insurance coverages,
including the policy feature under which the defense costs  reduced the
applicable limits of insurance.  The Insureds also had received an insurance
coverage analysis from Vinson & Elkins.  Additionally, the Insureds had
been advised that Anglo American was in the English equivalent of bankruptcy. 
The summary-judgment evidence conclusively proves that the Brokers= acts and practices alleged to be
unfair or deceptive occurred before August 29, 2001, and that the Insureds, in
the exercise of reasonable diligence, should have discovered the occurrence of
the
alleged unfair or
deceptive acts or practices more than two years before the Filing Date.  See
Mausker, 2003 WL 21403464, at *4 (affirming summary judgment dismissing
article 21.21 claims against agent relating to procurement of insurance
policies based on statute of limitations and holding that plaintiff should have
discovered that the terms of the policies were not as stated by the agent by
reading the policies or descriptions of the policies).  Therefore, the Insureds= third sub-issue lacks merit. 
Because all of the sub-issues lack merit, we overrule the Insureds= first issue and affirm the trial
court=s partial summary judgment.








B.        Did the trial court err in
granting the Brokers= motion for directed verdict as to
the Insureds= breach-of-fiduciary-duty claims?

In their second issue, the Insureds
argue that the trial court erred in granting the Brokers a directed verdict as
to the Insureds= claims for breach of fiduciary duty because the Insureds
raised fact issues regarding the existence of a formal or an informal fiduciary
relationship.  In a subsidiary argument, the Insureds contend that, because a
fiduciary relationship exists, it is presumed that their injury was inherently
undiscoverable and that the statute of limitations was tolled.                       

Standard of Review 

Judgment without or against a jury
verdict is proper at any course of the proceedings only when the law does not
allow reasonable jurors to decide otherwise. City of Keller v. Wilson,
168 S.W.3d 802, 823 (Tex. 2005).  Accordingly, the test for legal sufficiency
is the same for summary judgments, directed verdicts, judgments notwithstanding
the verdict, and appellate no-evidence review.  Id.  When reviewing the
legal sufficiency of the evidence, we consider the evidence in the light most
favorable to the Insureds and indulge every reasonable inference that would
support it. Id.  We must credit favorable evidence if a reasonable
factfinder could and disregard contrary evidence unless a reasonable factfinder
could not. See id. at 827. We must determine whether the evidence at
trial would enable reasonable and fair-minded people to find the facts at
issue.  See id.  The factfinder is the only judge of witness credibility
and the weight to give to testimony. See id. at 819.

Formal
Fiduciary Relationship








The Insureds first argue that a
determination of whether a broker is an agent of the insured is a question of
fact.[20]  According
to the Insureds, they raised a fact issue concerning whether the Brokers had a
formal fiduciary relationship with the Insureds.  The Insureds rely on case law
in which courts note that an insurance agent Aacts for the insured in making the
application for insurance and processing the policy@[21] and on non-insurance cases
addressing the duties generally owed by an agent to his principal.[22]


Although the existence of facts
giving rise to a fiduciary duty is a question for the factfinder=s determination, the issue of whether
those facts give rise to a formal fiduciary relationship is a question of law. 
See Brewer & Pritchard, P.C. v. Johnson, 7 S.W.3d 862, 

867 (Tex. App.CHouston [1st Dist.] 1999), aff=d, 73 S.W.3d 193 (2002); Fuqua v. Taylor, 683
S.W.2d 735, 737B38 (Tex. App.CDallas 1984, writ ref=d n.r.e.). A>[N]ot every relationship involving a
high degree of trust and confidence rises to the stature of a fiduciary
relationship.=@ Meyer v. Cathey, 167 S.W.3d 327, 330 (Tex. 2005)
(quoting Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 176B77 (Tex. 1997)).  The Insureds cite
no case recognizing a formal fiduciary relationship between an insured and its
insurance broker, or the agency employing the broker, or the owner of the
agency.[23]  








Significantly, in their
case-in-chief, the Insureds did not bring forward any evidence that a fiduciary
relationship existed between the parties.  On appeal, the Insureds argue
generally that A[t]he trial record speaks for itself and contains ample
evidence of Defendants= fraud, breach of fiduciary duty[,] and statutory
violations.  Plaintiffs cannot replicate herein the extensive documents and
days of testimony admitted to the jury.@ The Insureds contend that a formal
fiduciary relationship existed because the Brokers (a) Aselected and recommended insurers and
coverage@ to the Insureds, (b) Aprepared and processed@ the Insureds= applications for insurance, and
(c) procured the policies and delivered them to the Insureds in Texas.[24] 









After reviewing the evidence, we
conclude that reasonable and fair-minded people would not be able to find that
a formal fiduciary relationship existed between the Brokers and the Insureds.  See
Pickens v. Tex. Farm Bureau Ins. Cos., 836 S.W.2d 803, 805 (Tex. App.CAmarillo 1992, no writ) (stating that
an insurance agent has no duty to procure additional coverage for a customer Amerely because the agent has
knowledge of the need for additional insurance of that customer, especially in
the absence of evidence of prior dealings where the agent customarily has taken
care of his customer=s needs without consulting him@) (emphasis added).  A formal
fiduciary relationship is one created by law or by the nature of the contract
between the parties.  Peckham v. Johnson, 98 S.W.2d 408, 416 (Tex. Civ.
App.CFort Worth 1936), aff=d, 132 Tex. 148, 120 S.W.2d 786 (1938).  The Texas
Supreme Court has recognized that certain relationships constitute formal
fiduciary relationships as a matter of law.  See, e.g., Johnson
v. Peckham, 132 Tex. 148, 152, 120 S.W.2d 786, 788 (1938) (partners).  The
existence of a formal fiduciary relationship is determined by the relationship
between the parties, and if such a relationship is established, questions of
whether one party relied on or confided in the other are immaterial.  Johnson,
132 Tex. at 151B52, 120 S.W.2d at 788.[25] 
In this case, however, the Insureds cite no binding precedent recognizing a
formal fiduciary relationship under facts similar to those presented in this
case, and our own research has revealed none.  

Courts do not create fiduciary
relationships lightly.  Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d
171, 177 (Tex. 1997).  We decline to extend the set of formal fiduciary
relationships to encompass the relationship between clients and their insurance
agents, insurance agencies, and insurance brokers.  See T.F.W. Mgmt., Inc.
v. Westwood Shores Prop., 79 S.W.3d 713, 720 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied) (declining to create a fiduciary duty requiring the owner of a country
club to provide an accounting to a property owners= association of fees the association
provided to the club).

            Informal Fiduciary Relationship

The Insureds also contend that the
trial court erred in granting a directed verdict regarding the Insureds= breach-of-fiduciary-duty claims
because the evidence raised questions of fact regarding whether an informal
fiduciary relationship existed between the parties.  When a business
transaction is involved, Athe special relationship of trust and confidence must exist
prior to, and apart from, the agreement made the basis of the suit.@  Associated Indem. Corp. v. CAT
Contracting, Inc., 964 S.W.2d 276, 288 (Tex. 1998).  After reviewing the
record under the applicable standard of review, we conclude that the evidence
would not enable reasonable and fair-minded people to find that such a
confidential relationship existed between the Insureds and the Brokers prior to
the transactions that are the subject of the Insureds= claims.

We overrule the Insureds= second issue and do not reach their
argument that when a fiduciary relationship exists, it is presumed that the
injury caused by a breach of fiduciary duty is inherently undiscoverable, which
thereby tolls the statute of limitations.








C.        Did the Insureds preserve error as to their third
issue?

The
Insureds contend in their third issue that the trial court erred in failing to
grant their motion for judgment notwithstanding the verdict concerning their
Unauthorized Insurance Claims because the evidence conclusively established
that the only exception to liability invoked by the Brokers did not apply. 

The trial court charged the jury on
the Insureds= Unauthorized Insurance Claims.  Question 9 of the court=s charge was the first question
concerning these claims.  In it, the jury was asked whether the British
American policies were independently procured, which is an affirmative defense
that the Brokers asserted at trial.  Because of instructions contained in
questions 10, 11, and 12, the jury was not to answer any liability or damages
questions regarding the Unauthorized Insurance Claims unless the jury found in
question 9 that one of the policies was not independently procured.  The
Insureds objected at the charge conference that there was no evidence to
support the submission of question 9.  The Insureds did not object to the
instructions in questions 10, 11, and 12 that would result in the jury not
answering the liability and damages questions if the jury found that both
policies were independently procured.[26]








In answer to question 9, the jury
found that both policies were independently procured.  The jury obeyed the
court=s instructions in questions 10, 11,
and 12 and did not answer the liability and damages questions regarding the
Unauthorized Insurance Claims.  The Insureds filed a motion for judgment
notwithstanding the verdict and a supporting brief.  In that motion, the
Insureds asserted that the trial court should disregard the jury=s answer to question 9 because there
was no evidence to support it.  The Insureds further asserted that the evidence
at trial conclusively established liability and damages for the Unauthorized
Insurance Claims, so that the trial court should render judgment on these
claims without the need for any jury findings.  The trial court denied the
Insureds= motion for judgment notwithstanding
the verdict.  Under their third appellate issue, the Insureds now assert the
trial court erred by not rendering judgment in favor of the Insureds based on
the Unauthorized Insurance Claims, and the Insureds assert this court should
render judgment that the Brokers are liable under those claims and remand for a
new trial on damages under these claims.  There are several problems with the
Insureds= argument.

First, the Insureds never asked the
trial court to render judgment that the Brokers are liable on the Unauthorized
Insurance Claims and to order a new trial as to the damages under these
claims.  Therefore, the Insureds did not preserve error as to their third
issue.  See Tex. R. App. P. 33.1(a);
Weinberger v. Longer, 222 S.W.3d 557, 567 (Tex. App.CHouston [14th Dist.] 2007, pet.
denied) (holding that appellant failed to preserve error because it did not
present appellate complaint to trial court).  








Second, even if the Insureds were
asserting on appeal that the trial court erred in denying their motion for
judgment notwithstanding the verdict, the Insureds have not briefed this
argument.  Presuming for the sake of argument that the Insureds are correct
that the evidence is legally insufficient to support the jury=s answer to Question 9, this
insufficiency would only indicate that question 9 should be disregarded; it would
not provide a basis for judgment as a matter of law or for a new trial on the
Unauthorized Insurance Claims.  In accordance with this reality, the Insureds
argued in their motion for judgment notwithstanding the verdict that the trial
court should render judgment in their favor on the Unauthorized Insurance
Claims in the amount of $10,875,000 plus attorneys= fees because the trial evidence
conclusively proved that the Brokers were liable for these damages under the
Unauthorized Insurance Claims, obviating the need for jury findings.  However,
on appeal, the Insureds have provided no argument, citations to the record or
to authorities, and no analysis showing that the trial evidence conclusively
proved liability and damages as to the Unauthorized Insurance Claims. 
Therefore, even if the Insureds had assigned error as to the trial court=s denial of the motion for judgment
notwithstanding the verdict, they would have waived this issue by failing to
brief it.[27] 








Third, for the Insureds to be
entitled to a new trial based on the jury=s failure to answer the questions
10-12 because the jury followed the instructions in these questions, the
Insureds would have to have preserved error by objecting to the instructions in
questions 10-12 that caused the jury not to answer these questions.  See
Little Rock Furniture Mfg. Co. v. Dunn, 222 S.W.2d 985, 989B90 (Tex. 1949) (holding party that
failed to object to instruction that jury not answer a question based on its
answer to prior question waived that party=s right to have the jury make
findings as to the subsequent question), modified on other grounds by
Bradford v. Arhelger, 340 S.W.2d 772 (Tex. 1960);  Texas Employers= Ins. Ass=n v. Ray, 68 S.W.2d 290, 295 (Tex. Civ. App.CFort Worth 1933, writ ref=d) (holding appellant could not
complain of jury=s failure to answer question because the charge instructed
the jury not to do so based on its answer to a prior question and because
appellant did not object to this instruction);  Hunter v. Carter, 475
S.W.2d 41, 46 (Tex. Civ. App.CHouston [14th Dist.] 1972, writ ref=d n.r.e.) (concluding that, in case
in which jury followed instructions not to answer certain questions based on
its answer to a prior question,  party waived jury findings as to unanswered
questions by not objecting to the conditional submission of those questions); Whiteside
v. Tackett, 229 S.W.2d 908, 912 (Tex. Civ. App.CAustin 1950, writ dismissed) (same as
Hunter); Bankers Standard Life Ins. Co. v. Atwood, 205 S.W.2d 74,
77 (Tex. Civ. App.CAustin 1950, no writ) (same as Hunter); Spears
Dairy v. Davis, 125 S.W.2d 382, 383 (Tex. Civ. App.CBeaumont 1939, no writ) (same as Hunter
and stating that party is required to object to the conditioning instruction
and to anticipate that jury may answer initial question in such a way that it
fails to answer subsequent questions that are improperly conditioned on the
jury=s answer to the initial question). 
Having failed to object to these instructions, the Insureds have waived their
right to a new trial to allow the jury to answer the unanswered questions that
were conditioned on the jury not finding independent procurement in question 9.[28] 
Accordingly, we overrule the Insureds= third issue.  

D.        Did
the trial court err by excluding from evidence two issues of a trade
publication?

In their fourth issue, the Insureds
argue that the trial court committed reversible error by excluding as hearsay
two issues of Surplus Lines Reporter & Insurance News, an industry
trade publication.  We review a trial courts=s evidentiary rulings for an abuse of
discretion.  In re J.P.B., 180 S.W.3d 570, 575 (Tex. 2005) (per
curiam).  The trial court abuses its discretion if it acts without reference to
guiding rules or principles, or in an arbitrary or unreasonable manner.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985).  To reverse a
judgment based on a claimed error in admitting or excluding evidence, a party
must show that the error probably resulted in an improper judgment.  Tex. R. App. P. 44.1(a); Interstate
Northborough P=ship v. State, 66 S.W.3d 213, 220 (Tex. 2001).  To assess whether the
excluded evidence caused such harm, we review the entire record.  Interstate
Northborough P=ship, 66 S.W.3d at 220.  We must uphold the trial court=s evidentiary ruling if there is any
legitimate basis for it.  Owens-Corning Fiberglas Corp. v. Malone, 972
S.W.2d 35, 43 (Tex. 1998).








The Insureds argue that the two
issues of the trade publication were not offered for  the truth of the matters
reported, but were nonetheless essential to prove the Insureds= fraud claims.  According to the
Insureds, the November 1992 and October 1993 issues Areport[ed] on the criminal
investigation of Dieter Hugel[29] and the financial
instability of Ocean Marine@ and were offered Ato show that the Brokers were aware
of those problems as early as November 1992, prior to their December 1992
Placement.@  The Insureds= attorney argued to the trial court, A[The publications are offered] not
for the truth of the matter stated, but [for] knowledge and the relevant time
period of that knowledge. . . . [T]his is not hearsay.  It
is an operative fact that was known to these people.@  The Insureds= attorney elaborated that the
materials were offered to Ashow knowledge and awareness by the agency.@

The trial court excluded the two
exhibits as hearsay, and explained that the Insureds seemed to be offering them
for Athe truth of what the article says,
that on such-and-such a day, it was published and that there=s something untrustworthy about this
person that=s in the article.@  The Insureds= attorney responded, ANo, Your Honor.  I=m saying that this would have been
information that would have incited inquiry to have made inquiry [sic] into
this person, for one thing, and that that was not done.@  We conclude the trial court did not
abuse its discretion in excluding the material.  








First, there is no evidence that the
Brokers read these two issues of the trade publication; thus, they are not
probative of the Brokers= knowledge as the Insureds suggest.[30] 
Moreover, although the Insureds contend that the material was not offered for
the truth of the matters asserted therein, it appears that they offered these
two issues to show that the Brokers should have known of the truth of
statements made in this material, and should have had such knowledge at the
time these issues were published.  But A[t]he hearsay rules cannot be avoided
by this kind of circular reasoning.@  Nissan Motor Co. Ltd. v.
Amrstrong, 145 S.W.3d 131, 141B42 (Tex. 2004).[31] 
In fact, the Insureds do not merely contend that the Brokers should have known
of the matters alleged in the excluded evidence, but contend that, based on
information in these issues of the trade publication, the Brokers should have
concluded that Ocean Marine was financially unsound or should have conducted an
independent investigation of Hugel and Ocean Marine.  As in Nissan, the
Insureds= argument for admission rests on the
unsupported supposition that Awhere there=s smoke, there=s fire.@[32] Under these circumstances, we
conclude the trial court did not abuse its discretion in excluding this
evidence, and we overrule the Insureds= fourth issue.

E.        Should
this court address attorneys= fees?

In their fifth issue, the Insureds
contend that because the jury=s liability findings must be reversed and remanded, the
attorneys= fees findings also must be reversed and remanded. We disagree.  Because
this court affirms the trial court=s take-nothing judgment, there is no
basis to reverse and remand as to the attorneys= fees request.  Accordingly, we
overrule the Insureds= fifth issue.








F.        Is
the appeal from the trial court=s Non-Disclosure Order moot?              

The sixth and last issue concerns the
trial court=s Non-Disclosure Order granting Lexington=s AMotion to Enforce Confidentiality
Agreement.@[33]  The Insureds argue that the trial
court=s order prohibiting the Insureds and
their attorneys from using documents that Lexington considers confidential is
an injunction that expired upon entry of final judgment, or alternatively, is
void due to procedural defects.  Lexington has moved to dismiss the appeal of
this issue and to designate certain items in the record for in camera
review.

The Insureds ask this court to
declare that the trial court=s Non-Disclosure Order was dissolved upon the trial court=s rendition of final judgment and to
dismiss as moot the appeal from this order because, they argue, the order is no
longer in effect.  We conclude that the Non-Disclosure Order was void from the
moment it was signed and therefore the Insureds= appeal from this order is moot.

The Insureds named Lexington as a
defendant in this case. The Insureds later settled their claims against
Lexington as well as the claims between the Insureds and Lexington in the
Coverage Suit.  To effect this settlement, Lexington and the Insureds entered
into a Rule 11 agreement and a AGeneral, Full, and Final Release of All Claims and Indemnity
Agreement@ (hereinafter ASettlement Agreement@).  As part of this settlement, the
trial court signed an order dismissing Lexington from this suit at a time when
Lexington had not asserted a counterclaim or otherwise sought relief from the
court. Thereafter, the Insureds amended their petition without naming Lexington
as a defendant, thereby eliminating Lexington as a party in this case.  From
that point forward, the Insureds did not assert any claims against Lexington,
and Lexington was no longer a party in this case.  See Webb v. Jorns,
488 S.W.2d 407, 409 (Tex. 1972).  








Sometime later, Lexington, no longer
a party in the case, filed a AMotion to Enforce Confidentiality Agreement and For Entry of
Protective Order.@  In this motion, nonparty Lexington alleged that Varco
International, Inc, the parent company of the Insureds and a nonparty to this
case, had breached various agreements with Lexington, including the Settlement
Agreement, by filing several documents with the Texas Supreme Court in an
amicus brief.  To remedy this situation, nonparty Lexington asked the trial
court to enjoin nonparty Varco, as well as the Insureds and their counsel from
further use or disclosure, in this case or in any other proceeding, of any
documents designated by Lexington as AConfidential Information.@  After a hearing, the trial court
granted this injunctive relief in its Non-Disclosure Order.  The trial court
did not refer to this order in its final judgment.              If a trial
court still has jurisdiction over the parties and the case, and if one of the
parties to a settlement agreement amends its pleadings to assert a claim based
on breach of 

the settlement agreement, the trial
court, by normal rules of pleading and proof, can enforce the settlement
agreement in the same cause number as the case that was the subject of the
settlement agreement.  See Mantas v. Fifth Court of Appeals, 925 S.W.2d
656, 658 (Tex. 1996).  However, when Lexington filed its motion to enforce, the
Insureds already had nonsuited their claims against Lexington, and Lexington
was no longer a party.  Furthermore, the main target of the motion was Varco,
which may have been a party to the Settlement Agreement but was not a party to
this case.  Lexington=s involvement cannot fairly be deemed an intervention, nor
can Lexington be deemed an intervenor.  The motion Lexington filed was not a
plea in intervention either in form or in substance, and the trial court did
not treat it as such.  Lexington was not a party at the time the trial court
signed the Non-Disclosure Order. 








The trial court lacked the power to
grant relief in favor of a company that was no longer a party in the case; the
proper means for Lexington to have sought enforcement of the Settlement
Agreement would have been by an independent suit.  See id.  The Rule 11
agreement relating to the settlement was not filed with the trial court and was
not incorporated into any judgment or decree of the trial court.  In sum, at
the time of the Non-Disclosure Order, Lexington was not a party, and the claims
that had been settled were no longer a Asuit pending@ before the trial court.  See Tex. R. Civ. P. 11 (stating that A[u]nless otherwise provided in these
rules, no agreement between attorneys or parties touching any suit pending will
be enforced unless it be in writing, signed and filed with the papers as part
of the record, or unless it be made in open court and entered of record@).  For Lexington to enforce the Settlement
Agreement=s confidentiality provisions through injunctive relief, it was incumbent
upon Lexington to file an independent lawsuit against Varco and the Insureds
seeking this relief.[34]  See
Mantas, 925 S.W.2d at 658.  Therefore, the trial court=s Non-Disclosure Order was void from
the moment it was signed, and the Insureds= appeal from that order and their
sixth issue are moot.[35]  
Accordingly, we dismiss the appeal of this order as moot.  Given that we have
dismissed the appeal on other grounds, we also dismiss as moot Lexington=s motion to dismiss the Insureds= appeal from this order.[36] 


G.        Should
this court designate items for in camera review?








Lexington also has filed on appeal a AMotion To Designate Items for In
Camera Review@ (hereinafter AMotion to Seal@).  Lexington asks this court to
issue an order limiting inspection of certain documents contained in our
appellate record to in camera review.  Although Lexington never states
that it seeks to seal part of this court=s record, that is effectively the
relief it seeks.  Lexington does not allege, and our record does not reflect,
that the trial court sealed these documents in the trial court=s record.  On its face, Texas Rule of
Civil Procedure 76a, entitled ASealing Court Records,@ does not give appellate courts the
authority to find the necessary facts and to determine motions to seal on
appeal, and the Insureds have not cited any statute, rule, or case stating that
appellate courts have this authority.  See Tex. R. Civ. P. 76a.

Presuming, without deciding, that
this court has such authority, we conclude that Lexington has waived its right
to ask this court to seal the record as to these documents.  The record
reflects that on March 29, 2006, counsel for the Insureds filed a written
request with the clerk of the trial court, asking that the filings to which
these documents are attached be included in a supplemental clerk=s record to be filed in this court. 
The written request indicates that counsel for Lexington was informed of the
request by facsimile.  The district clerk filed an unsealed supplemental clerk=s record containing the documents in
question with this court on June 21, 2006.  Lexington did not ask this court to
seal the record until November 10, 2006, when it filed the Motion to Seal.[37] 
By then, the Insureds, Lexington, and the Brokers had filed their appellate
briefs, more than seven months had passed since the Insureds asked the district
clerk to file these unsealed court records with this court, and these unsealed
documents had been on file with this court for more than four months.  There is
no indication in the record that Lexington has ever filed a motion to seal the
trial court=s record as to these documents, and the documents continue to be
available to the public in the trial court.  On this record, we conclude that
Lexington waived any right it had to obtain an order sealing this part of the
appellate record.[38] 








                                                            III.  Conclusion

 The trial court did not err in
granting the Brokers= motion for partial summary judgment that the two-year
statute of limitations bars the Insureds= claims for negligence, negligent
supervision, negligent misrepresentation, and alleged violations of article
21.21 of the Insurance Code.  The trial court did not err in granting the
Brokers= motion for directed verdict as to
the Insureds= claims for breach of fiduciary duty.  The Insureds did not preserve
error as to their third issue regarding the Unauthorized Insurance Claims.  The
trial court did not abuse its discretion by excluding from evidence two issues
of a trade publication the Insureds offered at trial.  The Insureds= appeal from the Non-Disclosure Order
is moot because the order is void.  On this record, we conclude that Lexington
waived any right it had to obtain the relief sought in its Motion to Seal. 
Accordingly, we affirm the trial court=s judgment, dismiss as moot the
Insureds= appeal of the trial court=s Non-Disclosure Order, dismiss as
moot Lexington=s motion to dismiss, and deny Lexington=s Motion to Seal.  

 

 

 

/s/        Kem Thompson Frost

Justice

 

Judgment
rendered and Majority Opinion and Concurring and Dissenting Opinion filed April
17, 2008.

 

Panel
consists of Justices Frost, Seymore, and Guzman.  (Guzman, J., concurring and
dissenting).

 

 

 









[1]  In 1995, Drexel Holdings bought the Insureds.  In
April 1996, Tuboscope bought Drexel.  National Oilwell Varco later acquired
Tuboscope.  The record concerning the identities of the Insureds= successors in interest is less than clear, and we
refer to the Insureds and any such successors by the Insureds= names, as the parties have done. 





[2]  The Insureds=
successors in interest were also parties.





[3]  Tex. Civ.
Prac. & Rem. Code Ann. '
16.003(a) (Vernon Supp. 2006); Rice v. Louis A. Williams & Assocs., Inc.,
86 S.W.3d 329, 333 (Tex. App.CTexarkana 2002,
pet. denied); Hoover v. Gregory, 835 S.W.2d 668, 676 (Tex. App.CDallas 1992, writ denied).





[4]  Sibley v. Kaiser Found. Health Plan, 998
S.W.2d 399 (Tex. App.CTexarkana 1999, no pet.) (negligent supervision claim
is based on employer=s direct negligence).





[5]  Provident Life & Accident Ins. Co. v. Knott,
128 S.W.3d 211, 221 n.9 (Tex. 2003).





[6]  Article 21.21, section 16(d); Provident Life,
128 S.W.3d at 221.





[7]  Recodified as Tex.
Ins. Code Ann. '' 541.051B162.





[8]  In their AMotion
to Strike Defendants= Motions for Summary Judgment,@ filed on January 31, 2005, the Insureds state that
the motion was originally set for submission without oral argument on December
13, 2004, and then re-set for submission on February 7, 2005.  Although our
appellate record does not contain any notices of submission for the motion, it
does contain a notice that the motion was set for oral argument on January 31,
2005.  There is a handwritten notation on this notice indicating that the
motion will be re-set to February 7, 2005, but the notation does not reflect
whether this setting was to be by submission or oral hearing.  Our record does
contain a notice setting the motion for oral hearing on February 7, 2005, but
the record reflects that this notice was not filed with the trial court until
August 17, 2006, more than eighteen months after February 7, 2005 and at a
point in time after the trial court signed its final judgment.  The trial court
and the parties discussed a number of pending motions at a February 9, 2005
status conference.  It is clear from this colloquy that no oral hearing on the
motion had occurred on February 7, 2005, and that the motion had been set for
submission without oral argument on that date.





[9]  The trial judge stated that she had denied all
pending motions based on the untimeliness of documents that have been filed for
more than thirty days.  The Insureds=
motion to strike the evidence attached to the Brokers= reply was a motion pending on March 18, 20005 that
was based on the alleged untimeliness of documents that had been on file for
thirty days.  Therefore, the trial court denied the Insureds= motion to strike the evidence attached to the Brokers= reply.     





[10]  Our concurring and dissenting colleague states that
the record is unclear as to whether the Brokers= motion for summary judgment was submitted on March 18, 2005.  See
post at p. 2. However, on that date, the trial court unambiguously stated
that, on its own motion, it had set the summary-judgment motion for submission
on March 18, 2005.  We take the trial court at its word that it re-set the
motion so that it would be submitted to the court on March 18, 2005, for
determination without oral argument.  





[11]  Emphasis added.





[12]  In the final judgment, the trial court states that
it denied the Insureds= motion to reconsider.  





[13]  At one point in their appellate brief, the Brokers
assert that the trial court stated it had not considered the evidence attached
to the reply.  The Brokers do not affirmatively state that the trial court did
not consider the reply evidence.  The Brokers= statement is not so unequivocal as to constitute a judicial
admission.  The Brokers argue in their brief that the Insureds= claims are time-barred, that the reply evidence was
timely, and that the trial court noted, on the day it granted the motion, that
the reply evidence was timely because it was filed more than 21 days before the
March 18 submission date.  One inaccurate statement made in passing in the
argument section of the Brokers= appellate
brief does not change this court=s
analysis.  Our concurring and dissenting colleague concludes that, in this
sentence, the Brokers Aaffirmatively state . . . that the trial court did not
consider the evidence attached to their reply.@ Post at p. 2. A judicial admission must be clear, deliberate,
and unequivocal.  See Regency Advantage Ltd. P=ship v. Bingo Idea-Watauga, Inc., 936 S.W.2d 275, 278 (Tex. 1996).  The Brokers do
not clearly, deliberately, and unequivocally admit that the trial court stated
that it did not consider the reply evidence,  and they certainly do not admit
that the trial court did not consider the reply evidence.  See OAIC Comm.
Assets, L.L.C. v. Stonegate Village, L.P., 234 S.W.3d 726, 742B43 (Tex. App.CDallas
2007, pet. filed) (holding that appellate briefing did not contain unequivocal
and deliberate admission in light of all the arguments and statements made in
the briefing).  In the Insureds= opening brief,
the Insureds did not include a statement of fact that the trial court did not
consider the evidence filed by the Brokers on January 26, 2005.  The Insureds
incorrectly stated in their statement-of-facts section that, in its March 18,
2005 order, the trial court said its order was based solely on the
summary-judgment motion and response.  The Insureds argued in the next
sentence, AThus, the court did not consider the Brokers= late-filed evidence, and that evidence is not part of
the summary judgment record in this appeal.@ 
This sentence is a deductive legal argument based on the purported text of the
order; it  contains legal conclusions regarding whether the evidence was late,
whether the trial court considered it, and whether it is part of the
summary-judgment record on appeal.  The Insureds did not supply a record
citation in support of this assertion.  We conclude that this sentence is not a
statement of fact governed by Rule 38.1(f).  See Tex. R. App. P. 38.1(f) (stating that, in civil cases,
appellate courts will accept as true facts stated in statement-of-facts section
of appellant=s brief unless another party contradicts them).  Even
if this sentence were a statement of fact, we still would conclude the Brokers
contradicted it by noting in their appellate brief that the trial court denied
the Insureds= motion to strike the evidence and that the trial
court commented that the evidence in question was filed more than 21 days
before March 18, 2005. 





[14]  More than thirty days after the trial court signed
its final judgment, the Brokers filed a motion to modify the final judgment to
include a statement that the trial court considered their summary-judgment
reply.  This motion was untimely.  See Tex.
R. App. P. 329b(a), (g).  Furthermore, the Brokers never set this motion
for hearing, and our record does not reflect that the trial court ever
considered it. 





[15]  The trial court indicated in open court on March 18,
2005, that the evidence attached to the reply was timely because it was filed
more than 21 days before the March 18 submission date.  Nonetheless, the
Insureds argue on appeal that the trial court recognized that the evidence
attached to the reply was not timely and that the trial court did not consider
this evidence, a fact the Insureds claim is reflected by the language of the
March 18, 2005 order granting the motion.  Though courts can and sometimes do
affirmatively state in summary-judgment orders that they did not consider
certain evidence, they are not required to do so, and the trial court did not
do so in this case.  The recital language in the trial court=s order does not refer to the evidence attached to the
motion, to the response, or to the reply. We conclude that, in its March 18,
2005 order, the trial court did not specify the summary-judgment evidence upon
which its ruling was based.  We presume the trial court considered all timely
filed summary-judgment evidence.    





[16]  The Insureds also assert that (1) as for the Amiddle note@
sold in October 1992, the Brokers falsely represented the identity of certain
insurers and represented that certain insurers were bound when they were not
and that (2) the Brokers failed to disclose that the notes sold through British
American were not protected by the guaranty funds of either Louisiana or
Texas.  However, these allegations do not apply to the 1993 and 1994 placements
that are the subject of this sub-issue.





[17]  This subsection defines as unfair and deceptive acts
or practices in the business of insurance A[m]aking,
publishing, disseminating, circulating or placing before the public, or
causing, directly or indirectly, to be made, published, disseminated,
circulated, or placed before the public, in a newspaper, magazine or other
publication, or in the form of a notice, circular, pamphlet, letter or poster,
or over any radio or television station, or in any other way, an advertisement,
announcement or statement containing any assertion, representation or statement
with respect to the business of insurance or with respect to any person in the
conduct of his insurance business, which is untrue, deceptive or misleading.@  See Act of May 10, 2001, 77th Leg., R.S., ch.
290, ' 1, 2001 Tex. Gen. Laws 548, 548-51 (repealed and
recodified 2003) (current version at Tex.
Ins. Code Ann. '' 541.051B.061
(Vernon Supp. 2005)).





[18]  This subsection defines as unfair and deceptive acts
or practices in the business of insurance A[f]iling
with any supervisory or other public official, or making, publishing,
disseminating, circulating or delivering to any person, or placing before the
public, or causing directly or indirectly, to be made, published, disseminated,
circulated, delivered to any person, or placed before the public, any false
statement of financial condition of an insurer with intent to deceive.@  See Act of May 10, 2001, 77th Leg., R.S., ch.
290, ' 1, 2001 Tex. Gen. Laws 548, 548-51 (repealed and
recodified 2003) (current version at Tex.
Ins. Code Ann. '' 541.051B.061
(Vernon Supp. 2005)).





[19]    This subsection defines as unfair and deceptive
acts or practices in the business of insurance A[m]isrepresenting an insurance policy by: (a) making an untrue
statement of material fact; (b) failing to state a material fact that is
necessary to make other statements made not misleading, considering the
circumstances under which the statements were made; (c) making a statement in
such manner as to mislead a reasonably prudent person to a false conclusion of
a material fact; (d) making a material misstatement of law; or (e) failing to
disclose any matter required by law to be disclosed, including a failure to
make disclosure in accordance with another provision of this code.@ See Act of May 10, 2001, 77th Leg., R.S., ch.
290, ' 1, 2001 Tex. Gen. Laws 548, 548-51 (repealed and
recodified 2003) (current version at Tex.
Ins. Code Ann. '' 541.051B.061
(Vernon Supp. 2005)).

 





[20]  In support of this contention, the Insureds cite Don
Chapman Motor Sales, Inc. v. National Savings Insurance Co., 626 S.W.2d
592, 597 (Tex. App.CAustin 1981, writ ref=d n.r.e.). 





[21]  Guthrie v. Republican National Life Ins. Co.,
682 S.W.2d 634, 637 (Tex. App.CHouston [1st Dist.]
1984, writ ref=d n.r.e.). 





[22]  Johnson v. Brewer & Pritchard, P.C., 73
S.W.3d 193, 200 (Tex. 2002) (holding that an agent owes a fiduciary duty to his
principal).  





[23]  In contrast, the Brokers support their argument that
they did not owe any fiduciary duties to the Insureds with Choucroun v. Sol
L. Wisenberg Insurance Agency-Life & Health Division, Inc. and the
cases cited therein.  See No. 01-03-00637-CV, 2004 WL 2823147, at *4
(Tex. App.CHouston [1st Dist.] Dec. 9, 2004, no pet.) (mem. op.)
(holding that an insurance agent Aowed
no duty to explain the terms of the insurance policy to [the insured] or to
advise him on other, alternative policy coverages@)  (citing Critchfield v. Smith, 151 S.W.3d 225 (Tex. App.CTyler 2004, pet. denied); Moore v. Whitney-Vaky
Ins. Agency, 966 S.W.2d 690, 692 (Tex. App.CSan Antonio 1998, no pet.); and Pickens v. Tex. Farm Bureau Ins.
Cos., 836 S.W.2d 803, 805 (Tex. App.CAmarillo
1992, no writ)).





[24]  In support of these contentions, the Insureds
primarily rely on testimony from Mary Wallace, the Insureds= employee who testified that her Amain responsibilities@ were to handle Ahuman resources/benefits,@ but that she also Awas
more or less just the liaison between Environmental Procedures and the Dwight
Andrus insurance agency [and] George Guidry[.]@  But Wallace was not Athe
decision-maker regarding insurance@
for the Insureds.  Wallace testified, AWe
looked towards George Guidry as our trusted advisor.  It was his expertise in
the insurance industry.  That was his business.  We looked for him on what we
needed to do to have insurance for our business.@  Wallace stated that Guidry Aselected
the [insurance] companies[,]@ and she
described the insurance application process as follows: 

The
preliminary preparation was normally done in Andrus=s office. . . . Then it was
brought to Houston, along with the presentation, and then the balance of itCit was reviewed.  If there was [sic] any changes to be
made, any additions to be made to it, then it was changed, and then ultimately,
it was signed by . . . the secretary/treasurer of the [appellant]
corporation[s].





[25]  However, evidence of trust and reliance predating
the business relationship is material in determining whether an informal
fiduciary relationship exists.





[26]  In fact, the Insureds did not voice any objections
at all to questions 10, 11, and 12.





[27]  See Tex.
R. App. P. 38.1(h); Halim v. Ramchandani, 203 S.W.3d 482, 487 n.7
(Tex. App.CHouston [14th Dist.] 2006, no pet.).  Even if the
Insureds had briefed this argument, the record reflects that the trial evidence
did not prove liability and damages as to the Unauthorized Insurance Claims as
a matter of law.  Therefore, the trial court did not err in denying the motion
for judgment notwithstanding the verdict.





[28]  The Insureds rely on Spencer v. Eagle Star Ins.
Co. of Am., 876 S.W.2d 154 (Tex. 1994); however, Spencer is not on
point because it did not involve a conditional submission and because an
objection was made to the defect in the jury charge.  See supra
at p. 26; Spencer, 876 S.W.2d at 157 (holding that trial court erred in
rendering take-nothing judgment notwithstanding jury=s verdict in favor of plaintiff based on defendant=s properly preserved charge error and concluding that
proper remedy was for trial court to grant new trial based on the charge
error).





[29]  Hugel testified by videotaped deposition that he was
the founder of AGulf Coast Marine,@which
owns all of the stock in AOcean Marine.@ 
He further testified, AThe insurance company was Ocean Marine Indemnity
Company.  The managing general agency was Gulf Coast Marine.@  Ocean Marine Indemnity Company Limited was the only
insurer listed on Cover Note 92BA236, dated December 29, 1992, which provided
$5 million of umbrella coverage in policy year October 1, 1992 through
September 30, 1993.  





[30]  Andrus testified that he saw a Surplus Lines
Reporter & Insurance News in November 1992, but he did not state what
issue he saw.





[31]    In Nissan, the trial court admitted a
database of complaints Nissan received regarding unintended acceleration in one
of its models.  Nissan Motor Co. Ltd., 145 S.W.3d at 140.  The database
did not contain evidence that the complaints catalogued were the same as the
complaints asserted by the appellee.  Likewise, the exhibits at issue here
describe complaints against Ocean Marine and Hugel that are different from
those asserted by the Insureds.





[32]    The November 1992 issue reports that Louisiana ACommissioner of Insurance Jim Brown has filed suit
against players associated with failed Alliance Casualty and Reinsurance Co.,@ alleging that the defendantsCincluding Hugel and Ocean Marine Indemnity Co., the
errors and omissions carrier for Alliance=s
holding companyCoverstated Alliance=s
assets, which allegedly caused Alliance to become insolvent.  But this article
simply repeats allegations, and even the allegations differ from those made by
the Insureds.  Moreover, the October 1993 issue was published nearly a year
after the date on which the Insureds contend the Brokers should have been aware
of Ocean Marine=s financial difficulties and Hugel=s admitted crime.  Consequently, this issue is not
probative of the Insureds= contention that the Brokers should have been aware of
Hugel=s criminal activity or Ocean Marine=s financial difficulties before the coverage was
placed in 1992.  





[33]  Lexington moved to enforce the agreement after the
Insureds= attorneys filed material obtained in discovery in the
Coverage Suit as exhibits supporting an amicus brief filed in Lexington
Insurance Co. v. Strayhorn, 209 S.W.3d 83 (Tex. 2006).





[34]  In their response in opposition to Lexington=s motion in the trial court, the Insureds noted that
Lexington and Varco were not parties in this case and that the proper avenue
for Lexington to seek this relief is by an independent lawsuit.





[35]  A nonparty may seek relief from a trial court
regarding discovery sought from the nonparty by parties in a case pending in
the trial court.  See, e.g., Tex.
R. Civ. P. 192.6.  In fact, Lexington sought, in the alternative, a
protective order under Texas Rule of Civil Procedure 192.  The trial court did
not grant this relief, which was appropriate because Lexington did not assert
that any discovery was being sought from it in this litigation.  See id.






[36]  Even were we to address Lexington=s motion to dismiss, we would conclude that the
arguments asserted therein lack merit.





[37]  Lexington filed its motion to dismiss on March 7,
2006.  In this motion Lexington referred to 20 exhibits that it described as Afiled for the Court=s in
camera  inspection or alternatively under seal.@   The record does not reflect that the trial court
sealed its record as to these documents, and, in its motion to dismiss,
Lexington did not ask this court to seal its record as to these documents.





[38]  See In re R.D., 955 S.W.2d 364, 366 (Tex.
App.CSan Antonio 1997, pet. denied) (holding parties waived
any right they had to ask that appellate record be sealed).  To the extent
Lexington asserts the Insureds= alleged
violations of the Non-Disclosure Order as a basis for this motion, we already
have concluded that this order is void.